R.J. MILLER, INC., A NEBRASKA CORPORATION, APPELLANT, V.
MICHAEL J. HARRINGTON AND CAROLINE A. HARRINGTON,
DEFENDANTS AND THIRD-PARTY PLAINTIFFS, APPELLEES, AND
SAM CORTESE, DOING BUSINESS AS SAM CORTESE REAL ESTATE
COMPANY, THIRD-PARTY DEFENDANT, APPELLEE.

618 N.W. 2d 460

Filed September 29, 2000. No. S-99-814.

Robert E. Sullivan, of Haessler, Sullivan, Nygren, Klein, Ltd., for appellant.

Becky J.W. Dias and Loren L. Lindahl, of Edstrom, Bromm, Lindahl & Sohl, for appellees Michael J. Harrington and Caroline A. Harrington.

J. Malachy Sullivan, of Sodoro, Daly & Sodoro, P.C., for appellee Sam Cortese.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The plaintiff-appellant, R.J. Miller, Inc. (the Millers), brought this suit against the defendants-appellees, Michael J. Harrington and Caroline A. Harrington, to recover repair costs incurred for structural damages to a building the Millers purchased from the Harringtons. The building had both residential and commercial components. The Millers alleged that the Harringtons failed to provide a disclosure statement as required by Neb. Rev. Stat. § 76-2,120 (Reissue 1996) and that the Millers suffered damage as a result of the alleged undisclosed defects. The Harringtons then filed a third-party petition against their real estate agent, Sam Cortese, doing business as Sam Cortese Real Estate Company (Cortese), for failing to provide them with the necessary disclosure form. At the bench trial, the Harringtons and Cortese each moved for a directed verdict (the proper motion in a nonjury trial is a motion to dismiss). The district court sustained the motions, and the Millers appealed. We affirm.

## BACKGROUND

In November 1996, the Millers, who were interested in acquiring a tavern business, were put in contact with the Harringtons, the owners of C.J.'s Saloon in Wahoo, Nebraska. On November 23, the parties met at C.J.'s Saloon to discuss a sale of the business and building. The Millers inspected the building at that time, and the parties signed a purchase agreement. The three-story building is approximately 110 years old and located in a business district zoned primarily for commercial use. The city, however, permits dwellings to be located above the ground floor. C.J.'s Saloon is located on the first floor of the building, and the basement is used as storage for the business. The contract and deed do not refer to an apartment or dwelling as part of the transaction. At the time of sale, however, one tenant lived on the second floor and paid rent. The third floor was vacant and did not have plumbing facilities.

The structural defects the Millers alleged were present at the time of sale consisted of a deteriorated north wall on the second

and third floors. Richard Miller (Miller) testified that he did not notice any damage on either floor during the inspection because the second floor was occupied and cluttered and the third floor was dark and illuminated only by a flashlight. The Millers had also been around the back side of the building on the north, but apparently did not notice any problems with the wall. Miller, however, did remember he had noticed that paint or wallpaper had been falling off the wall on the third floor. He asked the Harringtons about this during the inspection, and they responded that they had experienced water problems as the result of a bad roof but had since installed a rubber roof.

The sale of the business was contingent upon the formation of a corporation and acquisition of a liquor license. The Millers formed the corporation known as R.J. Miller, Inc., and obtained the necessary license. The sale was closed on February 4, 1997, and the Millers took possession within 3 days.

The second-floor tenant moved out in June or July 1997, and Miller stated he did not notice any problems with the building at that time. Miller testified that they were unaware of any structural defects until September 1997, when water came into the tavern through the north wall after a severe rainstorm. Miller admitted that it had rained during the summer without causing any water problems.

The Millers contacted a contractor in November 1997 to make temporary repairs. The contractor, John Vasa, testified that the north wall was leaning out and was "all cracked up." The Millers next had a structural engineer inspect the building. The engineer, William Lainson, inspected the building in November 1997 and also testified to its deteriorated condition due to an overloaded support beam. Lainson pointedly stated, however, that he was unable to determine how the wall would have looked at the time of the transaction. The Millers next offered evidence relevant to attorney fees allowed under § 76-2,120, and then rested.

The Harringtons and Cortese each moved for a directed verdict on the grounds that the evidence had not shown the wall was defective at the time of contract or closing and that § 76-2,120 was inapplicable due to the commercial purpose of the transaction. The Millers argued that because water damage had

occurred in the past, a disclosure statement was required under a plain reading of the statute. The district court reserved judgment until after trial and then sustained the motions for directed verdict, finding that the Millers had failed to meet their burden under § 76-2,120.

The Millers timely appealed. However, during the pendency of that appeal, the Harringtons reacquired the property through a trustee's sale on March 7, 2000, before any permanent repairs were made. The Harringtons have filed a motion with this court for summary dismissal due to mootness.

## ASSIGNMENTS OF ERROR

The Millers assign as error the district court's (1) finding that the Harringtons were not required to submit a disclosure statement to the purchasers and (2) grant of the Harringtons' and Cortese's motions for directed verdict.

## STANDARD OF REVIEW

Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the courts below. *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

A motion to dismiss in a nonjury trial is equivalent to a motion for directed verdict in a jury trial. *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997) (citing *Ethanair Corp. v. Thompson*, 252 Neb. 245, 561 N.W.2d 225 (1997)). When considering a motion to dismiss in a nonjury trial, a court must resolve every controverted fact in the nonmoving party's favor and give that party the benefit of every reasonable inference to be drawn therefrom. *Id.* When a trial court sustains a motion to dismiss, it resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw only one conclusion. *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560 N.W.2d 424 (1997) (citing *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996)).

## ANALYSIS

Although the Harringtons contend that this case has been rendered moot by their reacquisition of the property, we conclude

that the issue of damages is still alive because the Millers paid $2,880 for temporary repairs to the wall.

The Millers first assign as error the district court's finding that the Harringtons were not required to submit a disclosure statement to the purchasers. Although the trial court did not specify this as a reason for the directed verdict, the Harringtons respond that the court could have found that the Millers had failed to show that the property was residential for purposes of § 76-2,120.

Section 76-2,120(2) provides that "each seller of residential real property located in Nebraska shall provide the purchaser with a written disclosure statement of the real property's condition." Section 76-2,120(1)(c) defines residential property as "real property on which no fewer than one or more than four dwelling units are located." In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *King v. State, ante* p. 14, 614 N.W.2d 341 (2000); *Hobza v. Seedorff Masonry, Inc.*, 259 Neb. 671, 611 N.W.2d 828 (2000). Further, the Legislature has pointedly limited the definition of residential property when that was its intent. See, e.g., Neb. Rev. Stat. § 52-129(2) (Reissue 1998) ("[r]esidential real estate shall mean . . . real estate . . . containing not more than four dwelling units and no nonresidential uses").

In this case, § 76-2,120 contains no ambiguity in its terms. Under its plain language, the sale of any property consisting of at least one dwelling unit, but not more than four units, will trigger the disclosure requirements. The statute makes no mention of the buyer's primary purpose for the purchase. The Millers contracted to purchase property with both commercial and residential components. The first floor was a tavern known as C.J.'s Saloon and constituted the Millers' primary purpose for purchasing the property. The Harringtons, however, also informed the Millers at the time of the inspection that the second floor was occupied by a tenant who paid rent. The tenant continued to live there and pay rent to the Millers for 4 to 5 months after closing. Because the property contained at least one dwelling unit, a disclosure statement was required under § 76-2,120(2).

The Millers next argue that because the Harringtons were required to disclose structural defects in the building and failed to do so, they are liable for water damages the building sustained as a result of those defects. Section 76-2,120(4)(f) requires the disclosure statement to include "any defects that materially affect the value of the real property or improvements." The disclosure statement shall be delivered to the purchaser "on or before the effective date of any contract entered into." § 76-2,120(7). Finally, § 76-2,120(11) provides that "[i]f a conveyance of real property is not made in compliance with this section, the purchaser shall have a cause of action against the seller and may recover the actual damages, court costs, and reasonable attorney's fees."

The Legislature, however, also indicated that the seller is only required to complete the disclosure statement "to the best of the seller's belief and knowledge as of the date the disclosure statement is completed and signed by the seller." § 76-2,120(5). Additionally, § 76-2,120(8) specifies that "[t]he seller shall not be liable under this section for any error, inaccuracy, or omission of any information in a disclosure statement if the error, inaccuracy, or omission was not within the personal knowledge of the seller."

We recognize that the personal knowledge requirement under § 76-2,120(8) is addressed to violations made when a written statement is actually provided to the buyer. Nonetheless, § 76-2,120(5) and (8) indicates that the Legislature was unwilling to impose liability on sellers with no knowledge of a property's defects. It would be anomalous to hold that a seller who fails to provide a written disclosure statement is strictly liable for unknown defects, while a seller who fails to include a defect in the statement is not liable unless his or her actual knowledge of the defect is shown. Thus, we conclude that the Legislature did not intend strict liability for failure to provide a written disclosure statement.

The Millers alleged in their petition that the Harringtons had actual knowledge of the north wall's defects. The Harringtons denied such knowledge in their answer. After the Millers had rested at trial, the Harringtons and Cortese each moved for a directed verdict based on their contentions that the Millers had

failed to prove the defects existed at the time of contract and that the statute was inapplicable to commercial transactions. The court reserved ruling on the motions, but noted that "there was no evidence that appeared on the record that the sellers had actual knowledge of the condition of the north wall."

The Harringtons admitted during the Millers' inspection of the property that the building had experienced water damage in the past. Nonetheless, they also informed the Millers that they believed that the problem had been corrected by installing a rubber roof. Most important, the Millers were not aware of any structural damage to the north wall before September 1997, 7 months after they had taken possession of the property. At that time, water did come into the first-floor tavern through the north wall after a severe rainstorm. Even so, Miller admitted that it had rained during the summer months without causing any water problems.

After the September storm, the Millers had a contractor and an engineer inspect the wall. While both men testified to the wall's damage upon inspection, the engineer stated that he was unable to say what the condition of the wall was at the time of the transaction. The fact that the Millers showed there was structural damage in September 1997 does not prove the defects existed at the time of contract in November 1996. Even construing the facts in the light most favorable to the Millers and giving them the benefit of every reasonable inference, the Millers have failed to prove that the Harringtons had actual knowledge of any structural defects at the time of the property's sale. Under these facts, the district court's grant of a directed verdict was correct as a matter of law.

Because we conclude that the district court correctly found the Harringtons had no actual knowledge of the building's defects and, therefore, are not liable for damages, it follows that Cortese cannot be liable to the Harringtons for failing to provide them with a disclosure statement.

## CONCLUSION

We affirm the district court's decision to grant a directed verdict in favor of the Harringtons and Cortese.

AFFIRMED.