IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

RUSTY'S FERTILIZER V. MALOLEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RUSTY'S FERTILIZER, INC., APPELLANT,
V.
FRED MALOLEY, APPELLEE.

Filed December 31, 2013.    No. A-13-089.

Appeal from the District Court for Dawson County, JAMES E. DOYLE IV, Judge, on appeal thereto from the County Court for Dawson County, CARLTON E. CLARK, Judge. Judgment of District Court affirmed as modifed.

Larry W. Beucke, of Parker, Grossart, Bahensky, Beucke & Bowman, L.L.P., for appellant.

Tod A. McKeone, of Heldt & McKeone, for appellee.

INBODY, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Rusty's Fertilizer, Inc. (Rusty's), appeals from the district court for Dawson County, which affirmed but modified the county court's decision. Rusty's generally argues that its motion to dismiss made at the close of Fred Maloley's evidence should have been granted, that Maloley failed to prove that Rusty's was negligent or that any negligence of Rusty's was the cause of damage to Maloley's crops, and that Rusty's was awarded an incorrect amount of damages. For the reasons set forth below, we affirm the district court's order as modified by this opinion.

## BACKGROUND

Maloley is a farmer, and in 2009, he entered into an agreement with Rusty's to apply fertilizer and herbicide on three of his fields. The fields were referred to as the "School quarter," "Webb field," and "Edeals field." Rusty's recorded Maloley's order on documents called

- 1 -

booking sheets, which identified the fields to be treated, the specific chemicals and amounts to be applied, the per unit cost for the chemicals, and the number of acres to be treated. The booking sheets also indicated the cost per acre for the service of spraying the chemicals on the ground. The customer is then expected to prepay the amount listed on the booking sheets.

Eugene Florell, president of Rusty's, testified at trial that the booking sheets guarantee the unit price for the chemicals but only provide an estimated cost because the total cost will be based on the actual amount of product applied. Maloley also referred to the booking sheets as estimates, but he testified that in his 25 years of farming experience, there is typically very little difference between the prepayment amount and the final invoice.

Maloley planted 70 acres of corn in the School quarter on May 8, 2009, and 121 acres of corn in Webb field. Rusty's sprayed chemicals on the fields the following day. Maloley irrigated the fields until September, but otherwise he did very little to inspect the crop until harvest. When Maloley returned to the field in early December 2009, he observed a distinct straight line down the middle of the School quarter. On the 28-acre tract on the south portion of the field, the corn was healthy and robust, but the corn on the 42-acre tract on the north portion was damaged and stunted. After harvesting the corn, Maloley determined that the south portion, normally the lower yielding portion of the School quarter, yielded 140 more bushels per acre than the typically higher-yielding north portion.

A majority of the evidence presented at trial addressed the cause of the damage to the north portion of the School quarter. Maloley presented the testimony of Dr. Dale Flowerday, a consulting agronomist. Dr. Flowerday opined that in light of the fact the damage to the north portion of the School quarter "was in a very straight line pattern, and the only things that go on in straight lines are fertilization and chemical application, hybrids, and irrigation," the damage was caused by "something that went on as a spray, or in the fertilizer." Dr. Flowerday's testimony will be set forth more specifically in our analysis section below.

Maloley was asked to address other factors that Rusty's claimed could have caused the damage. He testified that he planted the same seed hybrid from the north portion of the School quarter to almost the end of the south portion and also used that same hybrid in the Edeals field. Therefore, any damage caused by the seed hybrid would not have been limited to the north portion of the School quarter. He also testified that, although weather conditions can affect crop yield, that generally occurs if there is a break in planting time. However, he planted the entire field in the same day. Maloley testified that he has never seen an insect infestation or disease affect a straight line through a field. Maloley stated that the soil in the north portion of the School quarter is more fertile than that in the south portion and that the north portion has produced a significantly higher crop yield every year except 2009. According to Maloley, he irrigated the north and south portions equally in 2009, so any issues with irrigation would not have caused damage to the north portion alone.

In July 2009, Rusty's billed Maloley for the additional amounts due. Maloley noticed that the invoiced amounts were significantly higher than the amounts contained in the booking sheets. He also noted that he was charged for the herbicides Aatrex and Lumax for Webb field when he had requested that Rusty's apply Guardsman herbicide. At trial, Florell testified that Rusty's had run out of Guardsman during the application on Webb field and substituted the other herbicides,

which are more expensive. Based on the billing discrepancies and the problems with the north portion of the School quarter, Maloley refused to pay the remaining balances.

Rusty's filed an action in county court for the amount of the unpaid balance. In Maloley's answer, he asserted that he had been overcharged by Rusty's and that Rusty's had applied chemicals he had not requested which were more expensive than those he did request. Maloley also asserted a counterclaim against Rusty's for the crop damage he claimed was caused by Rusty's negligent application of chemicals to Maloley's field.

A bench trial before the Dawson County Court began on April 16, 2012. At the end of the first day, Maloley rested his case but reserved the right to call rebuttal witnesses. The case was then set for a second day of trial on May 4. During the interim, Rusty's filed a motion to dismiss Maloley's counterclaim. The motion was heard at the opening of the second day of trial, and the court denied Rusty's motion. Ultimately, the county court entered judgment in favor of Rusty's on its claim and awarded damages in the amount of $6,722.48. The court also entered judgment in favor of Maloley on his counterclaim and awarded damages in the amount of $23,520.

Rusty's appealed to the Dawson County District Court, and Maloley cross-appealed. Each party assigned several errors allegedly committed by the county court. As to the issues relevant to our case, the district court concluded that Maloley presented sufficient evidence in support of his counterclaim and affirmed the county court's denial of Rusty's motion to dismiss. The district court also affirmed the county court's determinations that Rusty's was negligent and that such negligence was the proximate cause of damage to the north portion of the School quarter. Finally, the district court concluded that the proper manner by which to calculate the amount due to Rusty's was based on the amounts contained on the booking sheets, as opposed to the invoiced amounts. Therefore, the district court found that the amount due from Maloley to Rusty's was $2,274.27 and modified the county court's judgment accordingly. Rusty's now appeals to this court.

ASSIGNMENTS OF ERROR

Rusty's asserts that the district court erred in affirming the county court's denial of Rusty's motion to dismiss and finding that Rusty's was negligent or that any negligence of Rusty's was the proximate cause of the damage to Maloley's crops. Rusty's also asserts that the district court erred in calculating the amount due Rusty's.

ANALYSIS

*Motion to Dismiss.*

Rusty's argues that the trial court erred in failing to grant its motion to dismiss at the close of Maloley's evidence. A motion to dismiss in a nonjury trial is equivalent to a motion for a directed verdict in a jury trial. *R.J. Miller, Inc. v. Harrington*, 260 Neb. 471, 618 N.W.2d 594 (2000). When considering a motion to dismiss in a nonjury trial, a court must resolve every controverted fact in the nonmoving party's favor and give that party the benefit of every reasonable inference to be drawn therefrom. *Id.* In order to sustain a motion for directed verdict, the court resolves a controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw only one conclusion. *Id.*

In rendering judgment as the finder of fact, a trial court resolves credibility issues and weighs the evidence in the same manner as does a jury. *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997). If there is any evidence in favor of the nonmoving party, the case may not be decided as a matter of law; at that point, a court must assume that all of the evidence presented by the plaintiff is true, even when the evidence is contradicted. *Id.*

Maloley's counterclaim alleged that Rusty's was negligent in its application of chemicals, and thus, Maloley was required to prove all of the elements of a negligence claim, including a legal duty owed by Rusty's to Maloley, breach of such duty, causation, and damages. See *Blaser v. County of Madison*, 285 Neb. 290, 826 N.W.2d 554 (2013). Rusty's claims that Maloley failed to prove causation because Maloley's initial position was that there was a "contaminant" in the sprayer and he failed to prove the exact contaminant that caused the damage. We disagree and conclude that Maloley adduced sufficient evidence to support the trial court's decision to deny Rusty's motion to dismiss.

As stated, Maloley's counterclaim asserted that the damage to the crops was the result of Rusty's *negligent application of chemicals*, not a contaminant in the sprayer, disproving Rusty's argument that Maloley initially claimed the damage was caused by a contaminant. Dr. Flowerday used the word "contaminant" during his testimony, but he also used the words "herbicide" and "chemical" when describing the cause of the damage to Maloley's crops. In fact, the first substantive question Dr. Flowerday was asked was to explain his understanding of the central issue of this case. He replied that Maloley suffered a loss to the north portion of the School quarter that was apparently due to the application of "some fertilizer or some chemical that damaged the crop." He was later asked, "And in your opinion, what caused [the corn] to die prematurely was the improper application or some kind of contaminant; is that correct?" Dr. Flowerday replied, "Right." Maloley also presented an affidavit that Dr. Flowerday completed prior to trial in which Dr. Flowerday stated that the damage to Maloley's crops was "caused by the improper application of chemicals."

Dr. Flowerday and Maloley also refuted Rusty's alternative explanations for the failed crop. Both witnesses explained why the damage could not have been caused by soil fertility issues, seed hybrid, planting time, weather, insects, disease, or irrigation, and explained that none of these conditions would have led to the distinct straight line through the field like that seen in the School quarter. Through a process of elimination, Maloley and Dr. Flowerday concluded that improper application of chemicals was the likely cause.

In finding in Maloley's favor on the counterclaim, the county court apparently found the testimony of Maloley and Dr. Flowerday credible, and we are not permitted to reevaluate the credibility of witnesses or reweigh testimony on appeal. See *McCully, Inc. v. Baccaro Ranch*, 284 Neb. 160, 816 N.W.2d 728 (2012). Because there was evidence presented in favor of Maloley establishing that the cause of the damage was the improper application of chemicals, the lower courts did not err in determining that Rusty's motion to dismiss should be denied. This assignment of error is without merit.

*Rusty's Negligence.*

Rusty's contends that the trial court erred in finding that Rusty's was negligent or that any negligence of Rusty's was the proximate cause of the damage to Maloley's crops. Rusty's

- 4 -

argues that Maloley never identified a contaminant that could have caused the damage, and Maloley's expert witnesses testified only as to what the cause could "possibly" have been.

The district court and appellate courts generally review appeals from county court for error appearing on the record. *Lesser v. Eagle Hills Homeowners' Assn.*, 20 Neb. App. 423, 824 N.W.2d 77 (2012). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact. *Meyer v. State*, 264 Neb. 545, 650 N.W.2d 459 (2002).

We conclude that the trial court's factual findings were not clearly erroneous and that its decision conforms to the law, was supported by competent evidence, and is not arbitrary, capricious, or unreasonable. As concluded above, Maloley presented sufficient evidence so that the trial court could find that the damage to Maloley's crops was caused by the negligence of Rusty's. After the court overruled Rusty's motion to dismiss, Maloley called Dr. Flowerday to the stand on rebuttal for further questioning.

Rusty's does not allege that Dr. Flowerday's opinion was inadmissible; rather, it argues that under the concept of differential diagnosis, the expert witness must identify an actual cause which, when the other potential causes are eliminated, becomes the most likely cause. On rebuttal, Dr. Flowerday testified to a reasonable degree of certainty in the field of agronomy that the only chemical that could have possibly caused the gradual damage to the crops was Lumax at an excessively high rate. Because one batch of Lumax covers approximately 28 acres, Dr. Flowerday opined that the south 28 acres was sprayed at the proper rate, but the north 42 acres was sprayed at an excessive rate.

The trial court clearly found Dr. Flowerday's testimony credible, and the testimony was sufficient to establish the causal connection between Rusty's actions and the damage to Maloley's crops. Based on the evidence presented at trial, we conclude that the lower courts did not err in finding that Rusty's was negligent and that negligence caused the damage to Maloley's crops.

*Rusty's Damages.*

Rusty's claims that the district court erred in its determination of the amount owed from Maloley to Rusty's. Rusty's argues that using the booking sheets to calculate damages was erroneous because the booking sheets were simply estimates and that the invoices accurately reflect the actual amount of product applied and billed.

The district court found that the booking sheets created a contract, and therefore, Maloley was required to pay for only the amount of product specified in the booking sheets. We agree with the district court's conclusion that a contract was formed but disagree that all of the terms were set forth in the booking sheets.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011). A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no

precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *Id.*

In limited circumstances, the parties' failure to specify an essential term does not prevent the formation of a contract. *Id.* "The Restatement (Second) of Contracts provides that 'the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.'" *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. at 861, 809 N.W.2d at 740. Sometimes, a court can ascertain the meaning of a party's promise by referring to the parties' course of dealing with each other, or a general reasonableness standard. *City of Scottsbluff v. Waste Connections of Neb., supra*. The circumstances must still show that the parties manifested an intent to be bound by a contract. *Id.* Their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy. *Id.*

Based on the evidence in this case, Rusty's and Maloley intended to enter into a contract whereby Rusty's would apply chemicals to Maloley's fields. The parties understood that through the booking sheets and prepayment, Maloley was "locking in" the price per unit and the products to be used, but there was no agreement on the volume of product to be applied. Maloley acknowledged that typically the amount invoiced differs to some degree from the estimated amount based on the actual quantity of product applied. The parties agreed that the quantity could vary, and although the variance in this case was much larger than usual, there was no limit specified on the booking sheets.

In *Professional Serv. Indus. v. J.P. Construction*, 241 Neb. 862, 491 N.W.2d 351 (1992), the Nebraska Supreme Court rejected the theory that a duty to hold close to an estimate in a contract arises simply because an estimated figure is stated. On the contrary, when an estimated figure is a guaranteed maximum or minimum, or when the parties expressly provide otherwise, only then may the court treat the estimate as a fixed amount to which the parties are contractually bound. See *id.*

Because the parties agree that the quantity contained in the booking sheets was merely an estimate and that there was no maximum amount specified, we conclude that Maloley was required to pay for the actual amount of product applied at the unit price listed on the booking sheets for the products he requested. As such, he must pay for the higher quantity for both fields but is not required to pay for the higher priced products, Aatrex and Lumax, that Rusty's substituted without Maloley's permission on the Webb field.

Our calculations are complicated by the fact that the parties did not provide us with the number of gallons of Guardsman that would have been required to spray 135 acres for Webb field. However, based on the application rate for the School quarter, we calculate that an acre of field requires .42 gallons of Guardsman, and thus, 56.7 gallons of Guardsman would have been applied to 135 acres on Webb field. For the School quarter, our calculation is based on the amount actually applied, which was 75 acres. We have included the following charts for clarification purposes:

|  |  | **School Quarter** |  |  |
| --- | --- | --- | --- | --- |
| **Chemical** | **Acres Sprayed** | **Quantity** | **Unit Price** | **Total** |
| Nitrogen | 75 acres | 18.12 tons | $384.00/ton | $ 6,958.08 |
| Aatrex | 75 acres | 14.8 gal. | $20.45/gal. | 302.66 |
| Lumax | 75 acres | 48.0 gal. | $62.95/gal. | 3,021.60 |
| Spray charge |  |  |  | 385.00 |
| Total Due |  |  |  | $10,667.34 |

|  |  | **Webb Field** |  |  |
| --- | --- | --- | --- | --- |
| **Chemical** | **Acres Sprayed** | **Quantity** | **Unit Price** | **Total** |
| Nitrogen | 135 acres | 31.15 tons | $384.00/ton | $11,961.60 |
| Guardsman Max | 135 acres | 56.7 gal. | $55.75/gal. | 3,161.02 |
| Spray charge |  |  |  | 665.50 |
| Total Due |  |  |  | $15,788.12 |

| | |
| --- | --- |
| Total due for Webb and School Quarter | $26,455.46 |
| Uncontested amount due for Edeals field | 11,761.27 |
| Total amount due Rusty's | $38,216.73 |
| Less:  Credit for return of chemical | ($487.00) |
| Payment made on May 2, 2009 | ($23,631.32) |
| Payment made on Aug. 20, 2009 | ( $9,000.00) |
| Final amount due Rusty's | $ 5,098.41 |

Based on the foregoing, we find that Rusty's is entitled to damages in the amount of $5,098.41 and modify the amount awarded accordingly. We note that this amount is actually higher than the amount to which Rusty's claims it is entitled. Rusty's argues that the difference between the amount billed for Webb Field ($4,785.09) and the estimate ($2,508.75) is $2,276.34, which represents the credit due to Maloley for substitution of the higher-priced Aatrex and Lumax for Guardsman. Rusty's then asserts that the credit should be subtracted from the total amount billed to Maloley ($6,721.46), arriving at an amount owed to Rusty's of $4,445.12. However, we disagree with the credit that Rusty's claims Maloley is owed because, although Maloley is not required to pay for the higher priced products, he still must pay for the actual volume of product applied, as we explained above.

CONCLUSION

We find that the district court did not err in affirming the trial court's denial of Rusty's motion to dismiss. Nor did the district court err in affirming the trial court's conclusion that Rusty's was negligent and that such negligence was the proximate cause of the damage to Maloley's crops. However, the district court did not properly calculate the amount of damages awarded to Rusty's because Maloley was required to pay for the actual amount applied as opposed to the estimated amount indicated on the booking sheets. We have modified the judgment to correct this error. Maloley is entitled to a judgment of $23,520 less $5,098.41, the

amount that is awarded to Rusty's, leaving a balance due to Maloley of $18,421.59. Accordingly, we affirm the district court's decision as modified.

AFFIRMED AS MODIFIED.