IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WEBSTER DESIGN ASSOCS. V. NEBRASKA CITY TOURISM

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WEBSTER DESIGN ASSOCIATES, INC., A NEBRASKA CORPORATION, APPELLANT,

V.

NEBRASKA CITY TOURISM & COMMERCE, INC., A NEBRASKA
NONPROFIT CORPORATION, APPELLEE.

Filed August 27, 2019.    No. A-18-984.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Alexis S. Mullaney, of Carlson & Burnett, L.L.P., for appellant.

Ryan K. McIntosh, of Brandt, Horan, Hallstrom & Stilmock, for appellee.

RIEDMANN, ARTERBURN, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

After Webster Design Associates, Inc. (Webster Design), presented evidence in a bench trial, Nebraska City Tourism & Commerce, Inc. (NCTC), moved to dismiss the amended complaint filed against it. The district court for Douglas County granted the motion, finding that Webster Design failed to prove that the parties entered into an oral contract or that it was entitled to damages on its quantum meruit claim. We affirm.

## BACKGROUND

Webster Design is a Nebraska corporation that provides marketing and advertising services. NCTC is a Nebraska nonprofit corporation comprised of Nebraska City business owners. Webster Design's amended complaint alleges that the parties entered into an oral contract for

Webster Design to provide a comprehensive branding campaign for NCTC but that NCTC failed to pay in full. The amended complaint also asserts a cause of action for unjust enrichment.

According to the evidence presented at the bench trial, a Webster Design employee, who is now deceased, traveled to Nebraska City in July 2013 and discovered the city was in the process of "doing a rebrand." Thereafter, he began to communicate with the executive director of NCTC at the time, Tim Pendrell, about Webster Design providing marketing and advertising services. Webster Design representatives traveled to Nebraska City on various occasions and met with members from the NCTC, the Nebraska City Area Economic Development Corp., Otoe County Visitors Committee, and the city of Nebraska City. During one of those presentations in December 2013, Webster Design's presentation included detailed ideas for brand development, print collateral, advertising, and event support. The record is unclear what involvement, if any, entities other than NCTC subsequently had with Webster Design; however, it is clear that Webster Design continued to communicate with Pendrell and provide advertising services promoting Nebraska City.

In March 2014, Dave Webster, owner of Webster Design, sent an email to Pendrell attaching a proposal for Pendrell's review. The proposal outlined the information that had been presented in December 2013 and included estimated costs. Webster's email to Pendrell indicated that Webster Design had reviewed its progress relative to its investment of approximately $72,000 in time and tried to estimate what still needed to be done to reach the numbers it was presenting. The proposal showed a total cost for creative services of $150,000 to which Webster Design applied a 30 percent discount for a total proposed cost of $105,000. It also included a proposed schedule of fees with an initial payment of $45,000 and 12 monthly payments of $5,000 "due upon acceptance of proposal." Webster asked Pendrell to "take a look and let [him] know [Pendrell's] thoughts."

In Pendrell's response, he asked when the initial payment would be due and indicated that he would have to do some financial planning to figure out how to pay for the work. Webster replied that he had sent the proposal to "open a dialogue" and that he was open to restructuring the fee schedule. At trial, Webster explained that the purpose of the proposal was to provide a breakdown of the various components of an entire campaign, including prices, and that it was not his expectation that the March 2014 email was memorializing previously agreed-upon prices; rather, it was an attempt to open a dialogue.

Emails included in the record establish that throughout late 2013 and 2014, the parties continuously communicated regarding the advertising and marketing work Webster Design was completing for NCTC with Pendrell making numerous requests. Thus, in April 2014, Webster Design opened a separate billing account for work it did for NCTC that it considered to be outside the scope of the original project. However, Nathan Perry, Webster Design's creative director, admitted at trial that some of the work which was billed separately actually was within the scope of the original project. In addition, he acknowledged that some of the work he did for NCTC was unsolicited. Perry said that he spent 2 days updating member profiles on the new website. He testified that Pendrell had not asked him to do so, but it was "value-added" and that he did so to go "above and beyond" to help NCTC. Perry also took photos of various businesses in Nebraska

City for the updated website, which Pendrell had not requested, and did so to make the website even better.

Much of the work Webster Design did was completed prior to the December 2013 presentation at which various entities had been present. According to David Day, Webster Design's expert witness, doing creative work for a potential client for purposes of soliciting its business is called speculative work. He explained that doing speculative work is common in his industry but he does not do it because it is unethical, in his opinion.

Webster testified at trial that he believed Webster Design and NCTC had a contract as of November 2013. He was asked what the terms of the agreement were, and he stated, "Well, we were asked to do work and we did it. It was quite that simple." He was asked if the parties had discussed costs at that point, and he said he "couldn't tell you that" and that there was no discussion or agreement of costs in writing.

Lisa Healy is an account director for Webster Design and was the account manager of the NCTC project. She opined at trial that a contract between the parties was formed the week after Webster Design sent the proposal to NCTC in March 2014. She did not believe that a contract existed before that time or that there was a contract in the fall of 2013.

At trial, Healy was shown a document received into evidence which includes the heading "Campaign Budget as of 4/8/2014." Healy described the document as a spreadsheet Pendrell brought to a meeting with her to show the amount NCTC had budgeted to pay Webster Design for its work. The amount shown under cash outflow for "advertising creative" on the spreadsheet shows a total of $104,995, and the total ending cash balance depicted shows a deficit of $81,845.

Tammi Thompson was the secretary and treasurer of NCTC in 2013 and its vice president in 2014. She explained that NCTC's board of directors did not approve Webster Design's initial proposal, but she agreed that NCTC hired Webster Design to create a new website and logos. Contrary to Healy's explanation, Thompson testified that the spreadsheet was a document Pendrell provided to NCTC's board of directors to show that if NCTC was to proceed with Webster Design's full proposal, it would "end up $81,845 in the hole."

Webster Design sent an invoice to NCTC in April 2014 for $35,000 and a second invoice in June 2014 for $11,285. NCTC paid both invoices for a total payment, including taxes, of $49,524.95. Webster Design billed NCTC an additional $62,819.70, which NCTC never paid. Thus, Webster Design commenced this action.

After Webster Design presented its evidence and rested at trial, NCTC moved to dismiss the amended complaint. NCTC argued that Webster Design had failed to meet its burden of proving that the parties entered into an enforceable contract. The district court recognized the ongoing relationship between the parties but found that the evidence of when a contract was formed and the terms of any contract was unclear and/or contradictory. The court determined that there was an agreement between the parties for Webster Design to recreate NCTC's website, but the evidence was unclear as to the terms, cost, scope, or any specifics of an agreement beyond that. Similarly, with respect to the quantum meruit claim, the court found that the evidence was unclear as to exactly what work was delivered and what that work meant in the scope of what it cost, particularly when so much of the work was done prior to the initial presentation. As a result, the district court granted NCTC's motion to dismiss. Webster Design appeals.

ASSIGNMENTS OF ERROR

Webster Design assigns that the district court erred in (1) finding that the terms of the agreement were insufficient to form an oral contract, (2) finding that its contract with NCTC extended only to the creation of a website, and (3) denying its quantum meruit claim.

STANDARD OF REVIEW

A motion to dismiss in a nonjury trial is equivalent to a motion for directed verdict in a jury trial. *R.J. Miller, Inc. v. Harrington*, 260 Neb. 471, 618 N.W.2d 460 (2000). When considering a motion to dismiss in a nonjury trial, a court must resolve every controverted fact in the nonmoving party's favor and give that party the benefit of every reasonable inference to be drawn therefrom. *Id*. When a trial court sustains a motion to dismiss, it resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw only one conclusion. *Id*.

When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions. *Cullinane v. Beverly Enters. - Neb.*, 300 Neb. 210, 912 N.W.2d 774 (2018).

ANALYSIS

*Oral Contract.*

In its first two assignments of error, Webster Design asserts that the district court erred in finding that the evidence presented at trial was insufficient to prove the formation of a contract between Webster Design and NCTC beyond an agreement regarding NCTC's website. Webster Design argues that the parties had a sufficient understanding of the scope of the advertising campaign, the products required, and the method of payment based on their oral arrangements in the fall of 2013 to create an enforceable contract whereby Webster Design would create brand standards, advertising services, print media, and other products at an hourly rate to fit within a budget of $105,000. We disagree.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Stitch Ranch v. Double B.J. Farms*, 21 Neb. App. 328, 837 N.W.2d 870 (2013). A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract. *Id*. A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *Id*.

In limited circumstances, the parties' failure to specify an essential term does not prevent the formation of a contract. *Id*. The Restatement (Second) of Contracts provides that the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. *Stitch Ranch v. Double B.J. Farms, supra*. Sometimes, a court can also ascertain the meaning of a party's promise by referring to the parties' course of dealing with each other, or a general reasonableness standard. *Id*. The

circumstances must still show that the parties manifested an intent to be bound by a contract. Their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy. *Id.*

It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *Id.*

A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. *MBH, Inc. v. John Otte Oil & Propane*, 15 Neb. App. 341, 727 N.W.2d 238 (2007). Thus, in the present case, Webster Design had the burden to prove that the parties formed a contract.

There is no doubt that the parties had an ongoing, working relationship, and, as the parties concede and the district court found, NCTC agreed to pay Webster Design to create a new website. However, with respect to the formation of a valid, legally enforceable contract, such that NCTC is responsible for payment beyond the approximately $49,000 it already paid, the evidence is unclear as to when an offer was made, when any offer was accepted, and the essential terms of any contract.

The initial presentations, at least through the end of 2013, involved not only NCTC, but also the Nebraska City Area Economic Development Corp., Otoe County Visitors Committee, and the city of Nebraska City. When Webster Design presented its ideas to NCTC's board of directors in December 2013, it appears that the other entities were also present. And as stated previously, Webster Design had completed a large amount of work by that point, without having been requested by anyone to do so. Webster Design did not submit a proposal including its ideas and associated costs to NCTC until March 2014. Webster testified at trial that it was not his expectation that the proposal was memorializing agreed-upon prices that had already been discussed, but rather, that the proposal was sent to "open a dialogue." Consistent with this belief, the proposal itself includes a proposed schedule of fees, which provides for an initial payment of $45,000 and 12 monthly payments of $5,000 "due upon acceptance of proposal."

However, Webster also opined at trial that the parties entered into an enforceable contract as of November 2013. When asked to detail the terms of that agreement, Webster responded that Webster Design was "asked to do work and we did it. It was quite that simple." He was asked if costs had been discussed at that point, and he said that he "couldn't tell you that" and that there was no discussion or agreement of costs in writing. Emails exchanged among Webster Design employees, including Webster, Healy, and Perry, in November and December 2013 reveal that at that point, even they were uncertain as to the budget for the NCTC project. And, as stated above, Webster Design's presentations were made to not only NCTC, but also to other entities associated with Nebraska City.

In contrast to Webster's testimony, Healy opined at trial that a contract between the parties was formed the week after Webster Design sent the proposal in March 2014. She did not believe that a contract existed before that time or that there was a contract in the fall of 2013.

Thompson testified that NCTC's board of directors did not accept or approve the initial proposal, which was presented in December 2013 and sent to NCTC in March 2014. She additionally explained that prior to the time the board of directors received the proposal, costs had

not been discussed. She explained that the budget spreadsheet was "something that [Pendrell] had put together" and provided to NCTC's board of directors to show that if NCTC were to proceed with the full proposal from Webster Design, NCTC would "end up $81,845 in the hole."

Furthermore, the evidence presented at trial was unclear as to exactly what work NCTC agreed to have Webster Design complete and how the work was to be billed. According to Thompson, NCTC accepted only a small portion of Webster Design's full proposal, which included redoing the website and creating new logos. It is undisputed, however, that the work Webster Design completed for NCTC went beyond a website and logos. Webster and Perry acknowledged that going into the December 2013 presentation, much of the work for which NCTC would be billed had already been done. Yet, according to Day, doing such speculative work is considered unethical. The exact extent of the work that was completed at that point is unclear, but based on the contents of presentation, Webster Design had already completed a significant amount of work. Moreover, Perry acknowledged that some of the work he did, such as updating member profiles on the new website and taking photos of various Nebraska City businesses, was not requested by NCTC, but rather, he did it to go "above and beyond" in order to help NCTC.

Additionally, the manner in which NCTC would be billed for Webster Design's work was not clear. The March 2014 proposal includes several different categories of work and the total costs for each, but there was no indication of whether the work would be billed hourly or as a flat fee and any corresponding amount other than a total amount for each category. Webster Design argues on appeal that the parties agreed that Webster Design would work at an hourly rate to fit within a total budget of $105,000. There is no evidence in the record to show that the parties agreed to any certain rate per hour, and Webster Design's timesheet for its work for NCTC displays different hourly rates for different employees' work.

This lack of clarity as to scope of work and costs became evident when, during the course of the parties' relationship, Webster Design began to claim that certain work was outside the scope of the original project. In an April 2014 email, Perry questioned where Webster Design's commitment to NCTC ended, indicating that the scope of work was not clear even to Webster Design's creative director. Ultimately, Webster Design began to bill such work separately. Yet at trial, Perry agreed that some of the work that Webster Design billed separately as being outside the scope of the original project was, in fact, included in the proposal, and thus, it actually was within the scope of the original project.

A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract. *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015). Although Webster Design presented evidence that the parties agreed that Webster Design would complete some work for NCTC, it did not present sufficient evidence to prove a meeting of the minds of the parties as to the essential terms and conditions of a contract, such as what work would be completed, when it would be completed, what the cost would be, and on what terms NCTC would have to pay for the work. Accordingly, the district court did not err in finding that Webster Design failed to meet its burden of proving the creation of a contract and that Webster Design was entitled to additional payment from NCTC beyond what it already paid.

*Quantum Meruit.*

Webster Design alleges that the district court erred in concluding that it was not entitled to recover additional compensation from NCTC based on the principles of quantum meruit. Based on our review, we affirm the decision of the district court.

Generally, the principle of quantum meruit is a contract implied in law theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another. *Tracy v. Tracy*, 7 Neb. App. 143, 581 N.W.2d 96 (1998). The issue of unjust enrichment is a question of fact. *Id*.

Where benefits have been received and retained under circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the recipient to pay the reasonable value of the services. *Id*. To give rise to an implied contract to pay, the services must have been rendered in expectation that the other party would pay. In turn, the other party must have accepted the services with knowledge of that expectation. *Id*.

Here, again, the evidence is unclear as to exactly what work was completed, what work NCTC expected to pay for, and the cost and/or value of the work that was delivered. As we explained above, much of the work Webster Design completed was done prior to the December 2013 presentation, and that presentation was made to multiple entities. The evidence was conflicting as to what work NCTC ultimately requested and agreed to pay for. Further, there were times where Webster Design offered to "take a stab" at something for NCTC and went "above and beyond" to help NCTC; thus, it is unclear as to whether NCTC was charged for that work or expected that it would pay for that type of work.

Finally, although NCTC paid Webster Design a total of approximately $49,000, the evidence is not clear as to what work that sum covered. In other words, the evidence did not establish what work NCTC requested be performed and the value of that work. Nor did it establish what work Webster Design contends was delivered but not paid for, or the value of that work. Thus, the district court did not err in concluding that Webster Design did not sufficiently prove that it was entitled to additional compensation on a theory of quantum meruit.

## CONCLUSION

We conclude that the district court did not err in finding that the evidence presented at trial was insufficient to meet Webster Design's burden of proving the creation of a contract and that NCTC was unjustly enriched by Webster Design's work. As a result, the court did not err in granting NCTC's motion to dismiss. We therefore affirm the court's decision.

AFFIRMED.