SUE ELLEN BURGESS, APPELLANT, V. JAMES R. MILLER AND JUDITH E. MILLER, APPELLEES.

621 N.W.2d 828

Filed January 16, 2001. No. A-99-1335.

Roger R. Holthaus for appellant.

Edward F. Fogarty, of Fogarty, Lund & Gross, for appellees.

HANNON, INBODY, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Sue Ellen Burgess brought an action to recover for water damages she allegedly incurred in a residence she purchased from James R. Miller and Judith E. Miller, pursuant to Neb. Rev. Stat. § 76-2,120 (Reissue 1996), which requires a seller of real property to provide the purchaser with a written disclosure statement of the real property's condition. At the close of Burgess' case in chief, the county court for Douglas County directed a verdict in favor of the Millers. On appeal, the district court affirmed. For the reasons stated below, we affirm.

## BACKGROUND

The property which is the subject of this action is a residence located at 12415 V Street in Omaha, Nebraska. John Francis testified that one or both of his parents occupied the home at 12415 V Street from approximately 1982 until his father died in July 1993. There were cabinets that covered the walls in the northwest corner area of the basement. His father had used this area for an office or activity area during most or all of those years and used the cabinets to store papers, boxes, and similar material. After his father died, Francis spent considerable time in the basement area preparing the home for sale, which preparation included removing the items from the basement, including the northwest corner room. Francis at no time noticed any water damage to any of his father's belongings stored in the cabinets or immediate area, and found no damage to the cabinets and no signs of water damage to his father's boxes and papers. Francis detected nothing "mildewy or musty" from the cabinet areas. The home was sold to the Millers in late 1993 for approximately $120,000, and at the time of the sale, Francis was not aware of any existing water problem.

James testified that the Millers bought the home in the fall of 1993 and took possession on December 6, 1993. Before they purchased the home, the Millers had obtained an independent inspection of the property. Under the section entitled "Basement & Foundation, Water Seepage," the inspection report stated: "Evidence of seepage-stains on north wall mainly at the northwest corner of the basement."

In preparing to sell the home, the Millers prepared and signed a disclosure statement on March 28, 1997, as required by § 76-2,120. The following question was on the disclosure statement: "Has there ever been leakage/seepage in the basement or crawl space? If yes, explain in Comment Section." The Millers answered no. James testified that he answered in this fashion because he had not experienced any water leakage or seepage in the basement. When asked about his knowledge of prior seepage, James maintained that he did not know of prior seepage; all he knew was that there was a waterstain on the northwest corner basement walls. The inspection the Millers had obtained in 1993 was not made available to Burgess when she purchased the property.

Burgess agreed to purchase the home from the Millers in April 1997. Her grandson, with whom she resided, had been left a quadriplegic following a car accident, and the home was attractive to Burgess because it possessed several amenities that her grandson would require, such as an elevator and a wheelchair ramp. Burgess had looked at over 50 houses, and the purpose in purchasing the home was to provide a suitable home for her grandson. After receiving the disclosure statement from the Millers, Burgess obtained an independent inspection of the home, partly for the reason that her grandson was susceptible to respiratory problems and she needed to confirm that the home was suitable for him in this and other respects. One section of the inspection obtained by Burgess, dated April 14, 1997, read as follows:

> Evidence of past moisture seepage noted at the northwest basement corner under the built-in cabinets. Interior was dry during inspection. A down spout was noted to dump in the area and should remained [sic] connected. Exterior grading and drainage should be maintained to help keep this area dry. This age of home has little built-in waterproofing, so surface water control is critical in keeping the basement dry.

This report caused Burgess to seek an explanation from the Millers as to the waterstains in the northwest corner. On April 16, 1997, Burgess provided a copy of an "Inspection Addendum Response" to the Millers that asked the following: "Explain seller's statement on Property Condition Disclosure Statement

Form Part II Sec. A #4 states No leakage/seepage in the basement. According to the inspection, water damage has been noted in the Northwest corner room with the cabinets. Have they made repairs due to water damage?" In the Millers' response, dated April 17, 1997, on the bottom of said document, they stated: "Present Sellers have never experienced leakage/seepage in basement during 3½ year period. Seller could speculate downspout left off once under previous owner to cause spot." Burgess testified that she relied on the disclosure statement and addendum before she went forward with the purchase.

Burgess purchased the home for approximately $171,000 and closed and took possession on approximately May 15, 1997. She had all the carpets cleaned to ensure that her grandson would not be subject to any allergens or dander and because she had smelled an odor in the basement. After Burgess bought the home, she made sure that the landscape met the house walls so that water would drain away from the home. There was a water faucet in the middle of the north outside wall and a downspout in the northwest corner area on the outside wall, and there may have been a water faucet on the west wall right above the northwest corner, but this is unclear from the testimony. The yard had an underground sprinkler system. Burgess had the roof gutters cleaned in the spring or summer of 1997. Burgess testified that the outside faucet on the north wall was not used after she moved in, at least not before water entered her basement.

During the night on or about September 2, 1997, Omaha suffered a very heavy rain. The next day, another grandson of Burgess went to the basement to prepare for school and discovered standing water in the basement. He had been in the basement the day before and found it to be dry. Burgess had the basement carpet and floor dried and cleaned, and the rotted cabinets torn out. The total amount expended by Burgess on the cleaning and cabinet removal was $3,293.18, which did not include cabinet or carpet replacement. Her petition prayed for a damage award of $5,227.64 based on her already expended costs and anticipating the replacement of the carpet and rebuilding of the cabinets.

Mark Dorner testified that he had been employed for 15 years in the business of waterproofing basements and that in that occupation, he visited the Burgess home on September 3, 1997,

and found the basement carpet saturated. He initially testified that the northwest corner of the basement was where the leaks occurred, but later in his testimony, he stated that he was of the opinion that the entire front or north wall and part of the side or west wall had water penetration "through water getting into the block walls." He proposed to fix the problem by installing an inside drain tile system and sump pump at a cost of $2,324. The work was begun on approximately October 1. He was of the opinion that it would be out of the ordinary for a basement to remain dry for 15 years and then just start leaking.

In 1982, the company for which Dorner worked had given an estimate to Francis' father for installation of the same type of drain system in the same area that was now being proposed to Burgess. Dorner's company did not install the drain system for Francis' father, and Dorner did not know if Francis' father experienced water problems after 1982. Dorner opined that the topography of the lot around the home was adequate to drain the water away from the home and that the enhancement of adding dirt would not have solved the basement leak.

Burgess testified that she believed that the Millers had water seepage or leakage in the past, that they were aware of it, and that they hid that information from her at the time of sale. Burgess testified that she believed that the Francises' did not have water problems in their 12 years of occupancy and that it occurred during the 3½ years that the Millers were in the home. No evidence was offered to support these beliefs.

At the close of Burgess' case in chief, the county court for Douglas County, in sustaining the Millers' motion for directed verdict, determined that by virtue of the addendum, the water-stains on the wall had been disclosed to Burgess by the Millers after the purchase agreement, but before closing, and that this is what the disclosure statement pursuant to § 76-2,120 required. The court noted that there was no testimony that the Millers had knowledge of seepage or leakage problems in the 3½ years they lived in the home and that there was no testimony that any leakage or seepage that may have been noted in March 1997 was, in fact, related to what caused the damage in September 1997. The court also found that there was no material misrepresentation in the disclosure statement or addendum, that the information was

fully disclosed by the addendum, that Burgess had personal knowledge from the inspection she had obtained and her own observation, and that there was no testimony as to what caused the damage.

The district court for Douglas County, on appeal from the county court, affirmed.

## ASSIGNMENTS OF ERROR

Burgess claims that the county court erred in (1) granting a directed verdict in favor of the Millers, (2) ruling that the Millers did not make a material misrepresentation, (3) failing to give proper credence to the Millers' testimony, and (4) overruling Burgess' objections in general.

## STANDARD OF REVIEW

■ In reviewing a trial court's ruling on a motion for directed verdict, an appellate court treats the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. *Dollison v. Mercy Servs. Corp.*, 7 Neb. App. 555, 584 N.W.2d 674 (1998). See *Blose v. Mactier*, 252 Neb. 333, 562 N.W.2d 363 (1997).

■ The party against whom a motion for directed verdict is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Dollison, supra*; *Suiter v. Epperson*, 6 Neb. App. 83, 571 N.W.2d 92 (1997).

■ In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion from the evidence. *Dollison, supra*. See *Blose, supra*. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Dollison, supra*; *Suiter, supra*.

■ Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the courts below. *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *Bohm v. DMA Partnership*, 8 Neb. App. 1069, 607 N.W.2d 212 (2000).

ANALYSIS

*Question of Material Misrepresentation and Directed Verdict.*
 Burgess' entire cause of action is based on § 76-2,120, which provides:

(2) On and after January 1, 1995, each seller of residential real property located in Nebraska shall provide the purchaser with a written disclosure statement of the real property's condition. . . .

(3) The disclosure statement shall include language at the beginning which states:

. . . .

(d) That the statement is a disclosure of the real property's condition as known by the seller on the date of disclosure;

(e) That the statement is not a warranty of any kind by the seller or any agent representing a principal in the transaction;

(f) That the statement should not be accepted as a substitute for any inspection or warranty that the purchaser may wish to obtain;

(g) That even though the information provided in the statement is not a warranty, the purchaser may rely on the information in deciding whether and on what terms to purchase the real property;

. . . .

(i) That the information provided in the statement is the representation of the seller and not the representation of any agent and that the information is not intended to be part of any contract between the seller and purchaser.

(4) In addition to the requirements of subsection (3) of this section, the disclosure statement shall disclose the condition of the real property . . . including:

. . . .

(f) The condition of all improvements on the real property and any defects that materially affect the value of the real property or improvements;

. . . .

(5) The disclosure statement shall be completed to the best of the seller's belief and knowledge as of the date the

disclosure statement is completed and signed by the seller. If any information required by the disclosure statement is unknown to the seller, the seller may indicate that fact on the disclosure statement and the seller shall be in compliance with this section.

. . . .

(8) The seller shall not be liable under this section for any error, inaccuracy, or omission of any information in a disclosure statement if the error, inaccuracy, or omission was not within the personal knowledge of the seller.

. . . .

(11) If a conveyance of real property is not made in compliance with this section, the purchaser shall have a cause of action against the seller and may recover the actual damages, court costs, and reasonable attorney's fees. The cause of action created by this section shall be in addition to any other cause of action that the purchaser may have. Any action to recover damages under the cause of action shall be commenced within one year after the purchaser takes possession or the conveyance of the real property, whichever occurs first.

 Because Burgess' suit is based solely on the above-referenced statute, our consideration of this matter is limited to determining if the Millers complied with the statutory requirements in light of our standard of review. Nebraska appellate courts have discussed this statute on only two previous occasions. In the recent case of *Bohm v. DMA Partnership*, 8 Neb. App. 1069, 1077, 607 N.W.2d 212, 218 (2000), we determined the elements of a cause of action under § 76-2,120 as follows:

Section 76-2,120 requires a seller of real property to execute and deliver a written disclosure of the real property's condition to the purchaser on or before the effective date of any contract for the sale of such realty. The disclosure must be completed to the best of the seller's knowledge and belief as of the date of disclosure. Noncompliance creates a cause of action in the purchaser against the seller for actual damages. A seller is not liable for any error, inaccuracy, or omission in a disclosure statement which was not

within the seller's personal knowledge. Thus, violations of § 76-2,120 must be done knowingly.

We also determined that the buyer's knowledge of undisclosed damage in a cause of action for failure to provide a disclosure statement is relevant on the extent of damages, but does not provide a total defense. "Thus, the buyer must plead and prove either that the seller failed to provide a disclosure statement or that the statement contained knowingly false disclosures by the seller." 8 Neb. App. at 1078-79, 607 N.W.2d at 219. Since the sellers in that case had not provided a disclosure statement as required by the statute, we reversed the trial court's grant of a demurrer to the seller and remanded the matter for further proceedings.

The Nebraska Supreme Court also recently addressed an action brought under § 76-2,120 in *R.J. Miller, Inc. v. Harrington*, 260 Neb. 471, 618 N.W.2d 460 (2000). Unlike the situation in the case at hand, the sellers in *R.J. Miller, Inc.* failed to provide the buyers with a disclosure statement. The buyers experienced water leakage through a wall of the property in question after a severe rainstorm which occurred approximately 7 months after they had taken possession of the property. The sellers admitted during the buyers' inspection of the property that the building had experienced water damage in the past; however, they also informed the buyers that they believed that the problem had been corrected by installing a rubber roof. While the buyers alleged in their petition that the sellers had actual knowledge of the wall's defects, the Supreme Court concluded that after construing the facts in the light most favorable to the buyers and giving them every reasonable inference, they failed to prove that the sellers had actual knowledge of any structural defects at the time of the property's sale. In affirming the trial court's directed verdict for the seller on the basis that the buyers failed to meet their burden under § 76-2,120, the Supreme Court held that the sellers cannot be liable to the buyers for failing to provide them with a disclosure statement, since the sellers had no actual knowledge of the building's defects.

We must determine whether Burgess has met her burden of proving an action under § 76-2,120. Based upon our review of the evidence and resolving the controverted facts and the inferences in favor of Burgess, we find that the Millers did not com-

plete the initial disclosure statement to the best of their belief because of their prior personal knowledge, from the 1993 inspection report, of "[e]vidence of seepage-stains on north wall mainly at the northwest corner of the basement." However, it is necessary to also review the addendum materials to determine whether the Millers failed to make the disclosures required by § 76-2,120. Based upon the language contained in the inspection obtained by Burgess, her ensuing inquiry in the inspection addendum, and the response by the Millers, we find that the Millers completed the addendum response to the best of their knowledge and belief. In other words, in response to the inspection by Burgess which noted evidence of past water seepage at the northwest corner of the basement, the Millers clarified that they had not experienced leakage or seepage during their residency and speculated that the previous owner left the downspout off once which caused the spot or stain. Burgess has failed to show that this addendum to the disclosure by the Millers was a knowingly false statement or that the Millers had actual knowledge of any other water damage not addressed in the addendum.

Since the addendum to the disclosure statement disclosed the condition of the basement to the best of the Millers' belief and knowledge, the motion for directed verdict was properly granted. These assignments of error are without merit.

*Credence Given to Millers' Testimony.*

Burgess assigns as error the county court's failure to give proper credence to the Millers' testimony. For example, Burgess points out, James testified to knowing of water damage and testified to answering no to the question on the disclosure statement asking if there had been leakage/seepage in the basement. Burgess asserts that these admissions, along with the other evidence, were sufficient for the county court to find in her favor, at least in establishing a prima facie case. Burgess also alleges that the testimony of some of the witnesses established that an attempt was made to conceal the true nature of the water damage and that it was more likely than not that a basement would have had some recurrence of leaks over time. Burgess complains that instead of giving credence to the Millers' testimony admitting to certain facts, including the fact that the Millers' inspection prior to their

purchase of the home disclosed the water damage and that the Millers failed to disclose that to Burgess, the court instead relied on the testimony of the Millers and Francis that indicated that leakage or seepage was never a problem. Burgess argues that the court relied on and gave greater weight to evidence and testimony which was insufficient to preclude a reasonable mind from reaching more than one conclusion on the matter.

We find no basis to conclude that the trial court did not properly consider all of the evidence, including the testimony and admissions of James. As we previously concluded, Burgess did not present any evidence that the Millers failed to disclose the condition of the basement to the best of their belief and knowledge in the addendum to the disclosure statement. This assignment of error is without merit.

*Ruling on Objections.*

Burgess also argues that exhibits 9 and 14 were improperly admitted over her relevancy objection. The exhibits are photographs depicting the property in 1999 after repairs had been made to the property. The photographs are of the exterior of the house and appear to us to have no relevance to the issues in this matter. This case was heard in a bench trial. There is a presumption that a court trying a case without a jury, in arriving at a decision, will consider only competent and relevant evidence, and an appellate court will not reverse a case so tried because other evidence was admitted when there is material, competent, and relevant evidence admitted sufficient to sustain the judgment of the trial court. *Nelson v. Metropolitan Utilities Dist.*, 249 Neb. 956, 547 N.W.2d 133 (1996). We find that there is material, competent, and relevant evidence admitted sufficient to sustain the judgment. This assignment of error is without merit.

## CONCLUSION

We find that under the circumstances presented in the instant case, there was no violation of § 76-2,120, and we therefore affirm the decision of the county court in granting the Millers' directed verdict.

AFFIRMED.