Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2019 09:06 AM CDT

CHARLES HUTCHISON AND MELISSA HUTCHISON,
APPELLEES AND CROSS-APPELLANTS, V. MARK
KULA AND RENIE KULA, APPELLANTS
AND CROSS-APPELLEES.

___ N.W.2d ___

Filed April 16, 2019.    No. A-17-1275.

1. **Trial: Witnesses.** In a bench trial of an action at law, the trial court is
   the sole judge of the credibility of the witnesses and the weight to be
   given to their testimony.
2. **Witnesses: Evidence: Appeal and Error.** An appellate court will not
   reevaluate the credibility of witnesses or reweigh testimony but will
   review the evidence for clear error.
3. **Judgments: Appeal and Error.** The trial court's factual findings in a
   bench trial of an action at law have the effect of a jury verdict and will
   not be set aside unless clearly erroneous.
4. ____: ____. In reviewing a judgment awarded in a bench trial of a law
   action, an appellate court does not reweigh evidence, but considers the
   evidence in the light most favorable to the successful party and resolves
   evidentiary conflicts in favor of the successful party, who is entitled to
   every reasonable inference deducible from the evidence.
5. **Actions: Pleadings.** Two or more claims in a complaint arising out of
   the same operative facts and involving the same parties constitute sepa-
   rate legal theories, of either liability or damages, and not separate causes
   of action.
6. **Actions: Real Estate: Sales: Pleadings: Proof.** To state a cause of
   action under Neb. Rev. Stat. § 76-2,120 (Reissue 2018), the buyer must
   plead and prove either that the seller failed to provide a disclosure state-
   ment or that the statement contained knowingly false disclosures by
   the seller.
7. **Appeal and Error.** An appellate court is not obligated to engage in
   an analysis which is not needed to adjudicate the case and controversy
   before it.

8. **Attorney Fees: Appeal and Error.** A party may recover attorney fees and expenses in a civil action only when a statute permits recovery or when the Nebraska Supreme Court has recognized and accepted a uniform course of procedure for allowing attorney fees.
9. **Real Estate: Sales: Attorney Fees.** Attorney fees are mandatory in an action under Neb. Rev. Stat. § 76-2,120(12) (Reissue 2018).
10. **Attorney Fees: Appeal and Error.** When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion.

Appeal from the District Court for Sarpy County: Stefanie A. Martinez, Judge. Affirmed.

Blake E. Johnson, of Bruning Law Group, for appellants.

Douglas W. Ruge for appellees.

Pirtle and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

Charles Hutchison and Melissa Hutchison purchased a house located in Bellevue, Nebraska, from Mark Kula and Renie Kula. The Hutchisons subsequently sued the Kulas in the Sarpy County District Court due to problems related to the real estate purchase, namely, water intrusion, a leaking window, a defective refrigerator fan and garage door keypad, and a dead tree. After a bench trial, the district court found the Kulas liable for (1) violation of Neb. Rev. Stat. § 76-2,120 (Reissue 2018) (governing seller real property condition disclosure statements), (2) fraudulent misrepresentation, (3) negligent misrepresentation, and (4) fraudulent concealment. The Hutchisons were awarded $16,744 in damages, plus costs and $10,000 in attorney fees.

The Kulas appeal the judgment, and the Hutchisons cross-appeal, claiming they should have been awarded the entirety of the attorney fees requested rather than the partial amount awarded. We affirm the district court's order in all respects.

## II. BACKGROUND

### 1. The Kulas' Disclosure Statement

On June 22, 2015, the Kulas signed a "Seller Property Condition Disclosure Statement" (Disclosure Statement), which was received at trial as exhibit 1. The Kulas disclosed that they had owned and occupied the property for 7 years. We set forth only those portions of the Disclosure Statement relevant to the issues raised on appeal. Beginning with "Part I," by placing checkmarks in boxes next to the listed item, the Kulas disclosed that the following items were "Working": the refrigerator, the garage door keypad, and the sump pump.

In "Part II," "Section A. Structural Conditions," question No. 5 asks, "Has there been water intrusion in the basement or crawl space?" The Kulas placed a checkmark under "Yes." The form directs that if the answer to any item in section A is "Yes," the seller is to explain the condition in the comments section of "Part III" of the Disclosure Statement. In the comments section, the Kulas handwrote: "section A - Structural Conditions - during 2014 during heavy rains, nei[g]hbor[']s sump pump not working, etc. some water (minor) seeped up in basement (NE [northeast] corner) - added additional drain system."

Also in part II, section A, the Kulas answered "Do Not Know" to question No. 9, "Are there any windows which presently leak, or do any insulated windows have any broken seals?" In part II, "Section D. Other Conditions," question No. 13 asks, "Are there any diseased or dead trees, or shrubs on the real property?" The Kulas placed a checkmark under "No." In the same section, question No. 14 asks, "Are there any flooding, drainage, or grading problems in connection to the real property?" Again, the Kulas placed a checkmark under "No."

The Kulas provided the Disclosure Statement to the Hutchisons prior to execution of the purchase agreement for the property in December 2015. The Hutchisons closed and took possession of the property in March 2016.

## 2. The Hutchisons' Claims

According to the Hutchisons' second amended complaint, immediately after moving into the property, there was water leaking "during rains." Allegedly, after closing in March 2016, they discovered "rust staining on the carpet and efflorescence staining on concrete slab" from previous water intrusions and that the "drain tile system did not function as designed for long before closing." They claimed that "[w]ithin a couple months of closing the carpeting in the basement started to mold," the carpeting was removed, and the "carpet nails were rusty." They asserted that vinyl flooring was removed, "revealing wetness and mold underneath." In May 2016, "gutter downspouts exit points were located buried under 2 inches of dirt with grass growing over it."

Regarding the Kulas' Disclosure Statement which noted a "minor" water leakage in the northeast corner of the basement in 2014, the Hutchisons claimed that the Kulas "had experienced other leakage or seepage issues in other areas and at other times[,] and leaking was known by them to be an ongoing problem with the home," and that the Kulas did not disclose the long-term and continuing water intrusion and "ongoing leaking issues." They claimed that upon moving into the property, the leakage or seepage in the basement and crawl spaces was most pronounced in the northwest corner of the house and "along the south of the house." And they alleged that the previous leak was not due to the neighbor's malfunctioning sump pump, contrary to what was represented in the Disclosure Statement. Purportedly, waterproofing companies gave the Kulas a proposal in 2014, and that work was limited to the northeast corner. The waterproofing companies allegedly "recommended more extensive remedial action." The Hutchisons claimed that waterproofing companies and contractors were "recommending repairs in the amount of $15,940 to waterproof and remedy damage to the basement areas."

The Hutchisons further alleged that the Kulas' representations about windows, the refrigerator, garage door keypad, and trees were "false and known to be false by the [Kulas]." They claimed that there was a leaking window, the refrigerator fan and garage door keypad did not work, and there was a tree that had been dead for over 1 year; they asserted it would cost $834 to remediate those issues.

The Hutchisons claimed that they read and relied on the representations in the Disclosure Statement and that the Kulas intended them to so rely and knew about these conditions or reasonably should have known and failed to disclose or misrepresented the condition of the home. The Hutchisons sought relief, claiming there was fraud and material misrepresentation and violation of § 76-2,120, fraudulent concealment, and negligent misrepresentation. They requested $16,774 in damages, plus costs and attorney fees.

The Kulas filed an answer denying the material allegations of the Hutchisons' complaint.

### 3. Trial

At the bench trial on July 13, 2017, witness testimony was presented and exhibits 1 through 40 were admitted into evidence.

### (a) The Hutchisons

Charles testified that the Hutchisons took possession of the property on March 7, 2016, and that he started moving in half of his "stuff" the following weekend. According to exhibit 5, the Hutchisons wed and went on a honeymoon from April 9 to 19, and the move was completed on April 23. Exhibit 5 is a timeline Charles created relating to alleged water intrusions, and during Charles' testimony, he often referred to photographs contained in exhibit 8 which depicted the various problem areas he described. The Hutchisons experienced several water intrusions in the basement "every time it rained" from March 26 to August 22 or 23, when Jerry's Basement Waterproofing (Jerry's) performed remedial work.

*(i) Water Intrusion*

According to Charles (either through testimony or exhibit 5), the first water intrusion occurred around March 26, 2016. This involved basement window leaks and water intrusion "along the floor, north section, the section where the faux wood tiles were along the west wall; and then that southwest corner, a little bit of dampness along that west wall in that corner." On April 20, during a rainstorm, the water intrusion was "severe"; the basement did not dry out again until all the tile and part of the carpet was removed on May 14. Also, the basement window "leak[ed] again" during the rainstorm. Charles described "water sitting in the windowsill" on the south wall with a "drip of the water coming down the wall" and "standing water outside the basement sliding glass door [located] in close proximity to the south wall . . . over an inch deep . . . just pooling there." Photographs from April 20 show carpetstains along the south wall. Another photograph shows the area where Charles thought the Kulas replaced carpet with a "tile product" (also referred to as a "wood faux tile") after the Kulas' water intrusion, and "when you stepped or pushed on the tile product, water would seep up through that tile product." On April 27, there were "longstanding water problems in furnace room." On April 29, a new downspout extension was purchased and installed on the southwest side of the property to mitigate pooling of water in front of the basement patio door.

On May 11, 2016, Jerry's inspected the water intrusion issues and recommended "interior drain systems with new sump & pump and exterior drain system around basement patio area." As of May 14, Charles said, "Everything stayed wet despite the fact [they] purchased a dehumidifier and brought fans down into the basement." The Hutchisons "noticed mold coming through the carpet" that was visible from the top of the carpet. According to Charles, a photograph relating to May 14 shows "a piece of wooden rail moulding" that was on the far north end of the basement. When that piece of moulding

was removed and flipped over, there was "black mold that had already grown substantially." Another photograph showed "a downspout that had been grown over by about two inches." He described that another photograph showed that the wood faux tile was "mildewy" and that upon pulling back tiles "to see how wet it was," there was no "area under that entire north section where the tile was that was not wet and mildewy or molding." They pulled all of the tile out; Charles referred to a photograph which showed that concrete underneath the tile was "all wet." Only "about a five foot by six foot, or so, piece [of carpet] had actually molded," so Charles cut and removed that as well as the wet carpet pad underneath that area. He rolled back the rest of the carpet to dry it out. He referenced photographs of the May 14 "stained and moldy carpet" and "residue of the previous carpet glue," where the Kulas allegedly removed and replaced carpet with tile, that "had started to mold because it had been wet for a couple of weeks." A downspout extension was added to the northeast corner that day, and another was added to the northwest corner on May 16. Charles claimed that there were no downspout extensions upon taking possession of the property. He stated that after recaulking the basement window on May 14, there were no additional "water drips in the window."

Charles described photographs from May 21, 2016, showing "moldy carpet glue in the northeast corner," "a piece where it looks like someone tried to seal the concrete crack," "rusty nails in the southwest corner," and "[in the northwest corner] darkened places where the water damage . . . ha[d] been able to discolor the concrete, similarly along the west wall." For May 26, it is noted that "[e]ven after downspout extension in place, water still pools outside basement sliding glass door." Charles testified that another water intrusion occurred on June 21 to the northwest corner and near the northeast corner when there had been rain of "only seventeen hundredths of an inch," and he described water intrusions July 2, 7, and 12 in the north, northwest, northeast, and/or west wall of the basement.

Charles indicated that in preparation for Jerry's installation of an interior drain system, the Hutchisons had to remove the bottom 36 inches of drywall and did so on July 30, 2016. He described photographs from that day as showing "mold[] on the back of the drywall and the stud that it had been connected to" and "moulding . . . with mildew/mold." On August 12, the Hutchisons experienced another water intrusion; Charles described the photographs from that day, saying, "[Y]ou can see that water is coming in all the way along that north wall. And in the photo below it, it continues all the way along that north wall and continues to come down that west wall on the photo below it." More water intrusions on August 19 were noted in exhibit 5 as along the west wall, northwest corner, and north wall. Charles claimed that on August 24, after Jerry's performed the remedial work, and "to this date, [the Hutchisons] have not had water in [their] basement."

### (ii) Refrigerator

Charles testified that as soon as the Hutchisons started using the refrigerator in March 2016, the food "just never got cold" so he "realized there was something wrong with the refrigerator." He said he called a repairman who on March 26 "diagnosed . . . the problem . . . was a fan motor"; the repairman installed the part about a week or so later and the refrigerator has worked since then.

### (iii) Garage Door Keypad

Charles said that from the time they moved in, the garage door keypad entry had not worked. He stated that "after replacing the batteries and doing a number of different things, the lights on the keypad would come on" but the garage door would not open. Charles "reprogrammed it to make sure that [they] had the code correct, and it still wouldn't work." Charles claimed that when Mark Kula came over on May 11, 2016, Mark "admitted to [Charles] that there had been problems in the past with the keypad." "He did not say it was not

working but they had had problems with it." Mark suggested that Charles change the batteries; "[h]e did not seem surprised that the keypad was not working." The Hutchisons eventually bought a new keypad.

### (iv) Tree

Charles testified that at the time the Hutchisons took possession in March 2016, "[l]eaves were not yet on the trees" and there had not been leaves on the trees when the Hutchisons visited the property in November 2015. He said that they did not notice that the tree was dead until the spring of 2016 when their tree never formed leaves. Melissa Hutchison testified that she believed the tree was dead at the time they bought the house, because "[the tree] never leaved that spring" and thought she had remembered that the Kulas maybe "had offered to pay for the tree after the fact and that [the Hutchisons] had pointed out to them that it was dead." But, Charles denied that Mark made this offer.

### (b) Mark Dorner

Mark Dorner testified that he is one of the owners of Jerry's and that he was familiar with the property because he provided an estimate for repair of the basement and Jerry's did the work on the property. Jerry's invoice dated August 27, 2016, and the accompanying bid from May 11 to Charles for basement work was received as exhibit 6. Dorner said the bid was something he recommended to remedy water problems and that Jerry's issued a warranty in connection with the bid. The invoice shows that the Hutchisons paid for an "[i]nside tile system installed as per contract" and for installation of a "new sump pump."

Although Dorner admitted he did not visit the property while the Kulas owned it, Dorner testified regarding exhibit 11, which was Jerry's invoice dated August 11, 2014, and the accompanying bid from June 21 to Mark for repair of the basement. The bid presented two options. Option 1 listed

prices for "sump well location by owner" and "battery backup pump." Dorner said that option 1 was the more expensive option, and he acknowledged that a notation in handwriting at the bottom of the bid indicated that a warranty is available for only option 1. Dorner stated, and exhibit 11 shows, that the Kulas chose option 2 with no warranty. Work was invoiced as follows: "Excavated Corner to expose [drain] tile system. Connected to it and run tail to daylight as per contract." To explain why a warranty was not issued for option 2, Dorner said, "[I]t would be a trial and error. It's something that will evacuate some of the water from the drain tile but may not give a complete dry basement."

### (c) Neighbor

A neighbor testified that her residential address is "next door" and immediately to the north of the property. The neighbor stated that she has a sump pump in her house and has had one ever since the property was bought, which was "[a]t least 11 years ago." She denied ever having a sump pump malfunction problem with her house in 2014. She said that in 2014, she talked with Renie about the Kulas' water issues at the property, but the neighbor denied saying that she was having sump pump malfunctions in those discussions.

### (d) Brad Lauritsen

According to Brad Lauritsen's resume, he is a mechanical engineer with experience in providing investigative engineering services for insurance claim cases, including property losses involving water infiltration. The purpose of his investigation report for this case was to render an opinion as to (1) the nature, extent, and history of water intrusion issues at the property and (2) the accuracy of the statements made in the Disclosure Statement regarding water intrusion issues of the property.

In his report, Lauritsen stated, "Most people think that a drain tile and sump pump system will prevent water from

entering their basement through the walls, during a heavy rain. This is not true." He explained that the "water table" is under the house and is the "level at which when digging down, one would reach water . . . . When it rains, the water table rises. If the water table rises higher than the floor of your basement, water can seep in between the basement slab and the foundation wall." He said a drain tile system is a system of perforated pipes around a house's foundation that "drain[s] into a pit located in the basement floor (the sump)." And, "[w]hen the water level in the sump pit rises, [a float switch in the sump pit] turns on the pump." He defined seepage as "when the basement floor gets some little rivulets and puddles of water, usually no deeper than 1/4 to 1/2″ deep, which soaks and ruins the carpet."

Lauritsen indicated that he added rain data to a timeline provided by Charles (the timeline in the report is similar to the timeline of exhibit 5). He verified the original rain data with the weather station at Offutt Air Force Base and verified the rainfall history for the preceding years using the same source. He stated that the rainfall data showed "daily totals." Lauritsen testified, "My findings were that, basically, the rainfall was fairly consistent, I believe, from 2010 to 2016." In his report, he wrote, "[I]t is not plausible the seepage only started as soon as [the Hutchisons] moved into the house. All conditions which would contribute to seepage remained the same." He testified as to what he meant by "all conditions." He stated that the patio was "a very flat area surrounded by landscaping with river rock draining water right onto it" and that there was "a gutter with no extension draining right at the top of that river rock that would direct water down" to the patio. The landscaping barrier prevented any water from draining out in the yard; he referenced a photograph of "a large amount of standing water on the patio that wasn't being drained off." He testified that "the drainage right at the foundation, around the perimeter of the house; particularly, in the back, wasn't

adequate" and that the foundation was "sloped toward the back of the house" and "was pretty flat right at the foundation and didn't really have the slope you would want to direct water away from the foundation." He stated that "a large contributor to basement seepage is not having that slope right to the foundation there." He stated that there were several areas of water intrusion, noting the areas of the patio, a depressed area along the west wall, and all along the north wall in the northeast corner. He said that if downspout extensions are missing, it is a "big sign" that water is being deposited "right on the foundation."

Lauritsen's report noted the Hutchisons "experienced water intrusion and leaking windows with only 0.37″ of rainfall during the first occurrence. It is nearly impossible this type of water infiltration was just happening for the first time during the first rainfall of the [Hutchisons'] occupancy." In relation to that statement, Lauritsen testified that he was shown the photograph of the basement window and that he verified the amount of rainfall, which he said was "a pretty small amount of rainfall, even if it occurred in a short period of time, to produce that type of water." And further, that "if that problem occurred with that little bit of rainfall right after it took place, there would be no reason to believe it didn't take place before [the Hutchisons] took possession of the house, as well, back any number of years."

On cross-examination, Lauritsen opined that "[t]he evidence [he] saw in the basement show[ed] a fairly long-term problem." He pointed out "there was some significant water intrusion" after the Hutchisons moved in that was "ongoing until it was fixed." He stated that it was "very unusual, in [his] experience, to see that much over that short of period of time and that consistent throughout varying levels of rainfall." That led him to believe that "since the conditions didn't change, as far as grading or construction or any type of repairs, when [the Hutchisons] took possession, those conditions existed prior to that as well."

Lauritsen's report shows that he also concluded that (1) "[t]he characterization of the water infiltration as 'minor' in the [Disclosure Statement] is inconsistent with [the Kulas'] statements in the deposition" and (2) "[a] non-functioning sump pump at a neighboring house did not contribute to water infiltration of the basement." According to his report, "A house's drainage system does not rely on a neighbor's sump pump and drainage system to keep water out of it." Further, the water intrusion at the property was "strictly from excess surface/rain water not being drained properly by the house's own perimeter drainage system." He observed that "the original drain tile system and sump pit were dry" and that water was "not getting into the pit to be pumped out." He said that did not mean the pump was malfunctioning, but, rather, that the pump "was never required to run because the sump never filled with enough water to trigger the float switch."

### (e) The Kulas

#### *(i) Water Intrusion*

Mark described the extent of the disclosed 2014 water intrusion, saying that "we had quite a rainy season [during spring to early in the summer], and all [of a] sudden we noticed the carpet in the northeast corner of the house . . . was starting to get damp." He stated that "as the rains continued, the dampness kind of traveled down along the wall." The northeast corner was where the "living area" of the downstairs was with the "couch, TV and everything." He testified that the leakage first occurred "a little bit down the wall. So it would have been down east a little bit on the north wall is where we first noticed it" and that the leakage "started creeping . . . and ultimately it made the little turn at the corner of the house and started to go along the — it would be the west side of the house a few feet." In Mark's deposition, he said the wetness of the carpet "progressed to where you could push down and, and feel the water."

When asked about the Disclosure Statement's question of whether there had ever been water intrusion, Mark claimed that "[he] remember[ed] responding that, yes, we had had a water intrusion in the one area of the basement, and [he] really didn't know what it was caused by. Rains. I heard maybe a sump pump. Could have been really anything." He further claimed that "we added an additional drain system out into, as Jerry['s] said, daylight, which worked." Mark said he indicated the water intrusion as "minor" because "a major water issue would be where your whole basement would flood" and "[t]his was, to [him], minor damage and a nuisance, yes, but it wasn't, to [his] definition, major." During Renie's deposition, she characterized the time of the 2014 water intrusion as "the time when [the Kulas] were having lots of water and stuff." At his deposition, Mark indicated he cited the neighbor's malfunctioning sump pump as a cause of the 2014 water intrusion due to "neighborhood gossip [that] the neighbor's sump pump failed." Renie asserted that she had "never spoken to [the neighbor]" and that the "sump pump part of [their disclosure] came from a neighbor across the street."

Mark said he never experienced any pooling on the patio on the south side of the property. Mark claimed he kept downspout extensions attached, except sometimes during the winter, and that he left the extensions at the property when he moved out. He claimed that the "sump pump was working fine" and that he "did not know [the drain tile system] was not functioning." He said that he has two children and one grandchild who "visited frequently" and that during their visits, they would stay in the property's basement. His deposition testimony revealed that he used the basement areas "[p]robably on a daily basis." He denied ever experiencing leaking with the basement window and said that "[the window] would have been right above where the kids and grandkid slept."

### (ii) Refrigerator and Garage
### Door Keypad

Mark testified that the garage door keypad was working when he moved out "[b]ecause that is how [the Kulas] actually made [their] last exit out of there." He claimed the refrigerator was working when he moved out because the Kulas "took [their] food immediately from that fridge over to the new fridge in [the Kulas'] new house." Renie testified that she "moved out on that Sunday, would have been March 6th," and that when she took everything out of the refrigerator to move it to their new home, "[a]t that time it was cool." She said, "There was ice cubes and everything. So at that time it was working."

### (iii) Tree

As to the tree, Mark remembered that when the Hutchisons did a walk-through inspection of the property in November 2015, he mentioned the tree "had lost its leaves early but that it was still green when you scratched it." Mark claimed that a lot of trees had been "stressed out because of all the water" and that he did not know if the tree was "going to come back in the spring or not." He alleged that he told Charles this concern and that if the tree did not come back, he would replace it. Mark admitted he did not know if the tree was stressed or diseased; he claimed that "[the tree] did not appear diseased to [him]" and that, in his opinion, "[s]tressed is not diseased." Renie testified that she had "gone out there [to the tree] many times" and that "[her] father worked for Earl May for 40-some years and [she] did a lot of work with him, and he always taught [her] to go out and scrape to see if a tree was green; that it was still living." At her deposition, Renie admitted that "the tree was stressed."

### 4. District Court's Decision

Following the bench trial, the district court filed an "Opinion and Order" in which it found the Kulas liable for

damages. The court found that the representations made by the Kulas in their Disclosure Statement were not accurate and not set forth to the best of their knowledge with regard to water intrusion issues. The court also found that the Kulas did not complete the Disclosure Statement to the best of their knowledge "with respect to the diseased or dead tree, garage door keypad, refrigerator, and leaking windows." The court stated, "It is clear that [the Kulas] did not complete the [Disclosure Statement] to the best of their knowledge and/or update it accordingly." The district court went on to find that the Hutchison's also proved fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment. The district court awarded the Hutchisons a judgment of $16,774, plus costs and $10,000 in attorney fees.

## III. ASSIGNMENTS OF ERROR

The Kulas claim that the district court erred in determining the evidence was sufficient to hold them liable for (1) violating § 76-2,120, (2) fraudulent misrepresentation, (3) fraudulent concealment, and (4) negligent misrepresentation.

The Hutchisons claim on cross-appeal that the district court erred in "not awarding all of the [Hutchisons'] reasonable attorney fees."

## IV. STANDARD OF REVIEW

[1-3] In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008). An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Id*. Similarly, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Id*.

[4] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but

considers the evidence in the light most favorable to the suc-
cessful party and resolves evidentiary conflicts in favor of the
successful party, who is entitled to every reasonable inference
deducible from the evidence. *Id.*

## V. ANALYSIS

### 1. Sufficiency of Evidence

[5] The Kulas "do not dispute the evidence adduced at trial"
and do not request this court "to set aside any factual find-
ing made by the trial court." Reply brief for appellants at 10.
Rather, the Kulas challenge the sufficiency of the evidence to
support the district court's conclusion as to the four theories
of recovery set forth in the Hutchisons' operative complaint:
violation of § 76-2,120, fraud and material misrepresentation,
fraudulent concealment, and negligent misrepresentation. We
note that although the operative complaint refers to separate
causes of action, the allegations all arise out of the same
operative facts and involve the same parties, and therefore
constitute separate legal theories rather than separate causes of
action. See *Poppert v. Dicke*, 275 Neb. 562, 747 N.W.2d 629
(2008) (two or more claims in complaint arising out of same
operative facts and involving same parties constitute separate
legal theories, of either liability or damages, and not separate
causes of action).

### (a) § 76-2,120

[6] We begin with a review of § 76-2,120, which requires
in subsection (2) that each seller of residential real property
located in Nebraska shall provide the purchaser with a written
disclosure statement of the real property's condition. Section
76-2,120 further provides:

>     (5) The disclosure statement shall be completed to the
>     best of the seller's belief and knowledge as of the date
>     the disclosure statement is completed and signed by the
>     seller. If any information required by the disclosure state-
>     ment is unknown to the seller, the seller may indicate

that fact on the disclosure statement and the seller shall be in compliance with this section. On or before the effective date of any contract which binds the purchaser to purchase the real property, the seller shall update the information on the disclosure statement whenever the seller has knowledge that information on the disclosure statement is no longer accurate.

If a conveyance of real property is not made in compliance with § 76-2,120, the purchaser shall have a cause of action against the seller and may recover the actual damages, court costs, and reasonable attorney fees. See § 76-2,120(12). However, "[t]he seller shall not be liable under [§ 76-2,120] for any error, inaccuracy, or omission of any information in a disclosure statement if the error, inaccuracy, or omission was not within the personal knowledge of the seller." § 76-2,120(8). See, also, *Bohm v. DMA Partnership*, 8 Neb. App. 1069, 1078-79, 607 N.W.2d 212, 219 (2000) (to state cause of action under § 76-2,120, "the buyer must plead and prove either that the seller failed to provide a disclosure statement or that the statement contained knowingly false disclosures by the seller").

The Kulas generally claim that evidence was insufficient to prove that they had actual knowledge of "some error, inaccuracy, or omission in the [Disclosure Statement]" as to each alleged property issue. Brief for appellants at 10. They contend that they testified as to their belief of the Disclosure Statement's accuracy. The Kulas argue that the Hutchisons speculated that "'because they experienced "X", then [the] Kulas must have had knowledge of some undisclosed condition,'" *id.*, citing that in *R.J. Miller, Inc. v. Harrington*, 260 Neb. 471, 618 N.W.2d 460 (2000), "circumstantial evidence alone [was found as] insufficient to impute knowledge to the seller for purposes of . . . § 76-2,120." Brief for appellants at 10.

It is obviously difficult to prove what someone may or may not have known at a particular point in time. In such

circumstances, consideration of conflicting or inconsistent evidence and the credibility of witness testimony is significant. We will therefore consider the district court's findings and conclusions as to each identified problem, keeping in mind that the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. See *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008). Further, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Id*. We will also consider the evidence in the light most favorable to the Hutchisons and resolve evidentiary conflicts in their favor because they are entitled to every reasonable inference deducible from the evidence. See *id*.

### (i) Water Intrusion

Regarding the 2014 water intrusion disclosure, the Kulas contend that they attributed the water intrusion they experienced to several potential causes, including "'heavy rains, nei[g]hbor[']s sump pump not working, etc.'" Brief for appellants at 11. They rely on *Burgess v. Miller*, 9 Neb. App. 854, 621 N.W.2d 828 (2001), to support their argument that their explanations of "the cause of the water intrusion problems they disclosed is not sufficient to prove they had actual knowledge of some undisclosed condition." Brief for appellants at 11. The Kulas cite to both *R.J. Miller, Inc. v. Harrington, supra*, and *Burgess v. Miller, supra*, to advance their position; we find both cases distinguishable, as discussed next.

In *R.J. Miller, Inc. v. Harrington, supra*, the purchasers brought an action against vendors to recover repair costs incurred for structural damages to a building purchased from the vendors. The purchasers alleged that the vendors failed to provide a disclosure statement as required by § 76-2,120 and that the purchasers suffered damages as a result of the undisclosed defects. Significant in that case, the vendors admitted during the purchasers' inspection of the property that the

building had experienced water damage in the past, but it was believed installation of a rubber roof corrected the problem. Also, the purchasers were not aware of any structural damage to the alleged defective wall until 7 months after they had taken possession of the property, and an engineer who testified for the purchasers was unable to say what the condition of the wall was at the time of the transaction. The purchasers also admitted it had rained during the summer months without causing any water problems. The Nebraska Supreme Court pointed out that structural damage in September 1997 did not prove the defects existed at the time of contract in November 1996. Therefore, the Supreme Court concluded that the district court properly found the vendors had no actual knowledge of the building's defects.

This court also addressed a purchaser's action under § 76-2,120 against sellers of residential real property to recover for alleged water damages incurred in that residence in *Burgess v. Miller, supra*. The sellers had purchased the residence in 1993 from a prior owner; before that purchase, the sellers obtained an independent inspection of the property, of which the inspection report revealed, "'Evidence of seepage-stains on north wall mainly at the northwest corner of the basement.'" *Burgess v. Miller*, 9 Neb. App. at 856, 621 N.W.2d at 831. In March 1997, the sellers completed a disclosure statement in preparation of selling the residence; to the question, "'Has there ever been leakage/seepage in the basement or crawl space? If yes, explain in Comment Section,'" the sellers answered no. *Id.* at 857, 621 N.W.2d at 831. One seller testified that he answered that way because he had not experienced any water leakage or seepage in the basement.

The purchaser agreed to buy the residence from the sellers in April 1997. After the purchaser received the sellers' disclosure statement, she obtained an independent inspection of the home (sellers' 1993 inspection report was not provided to the purchaser at the time of purchase). The 1997 inspection report stated, "'Evidence of past moisture seepage noted

at the northwest basement corner under the built-in cabinets. . . .'" *Id.* Thereafter, the purchaser sought an explanation from the sellers by way of providing them with a copy of an "'Inspection Addendum Response'" that asked: "'Explain seller's statement on [the disclosure statement form which] states No leakage/seepage in the basement,'" and pointed out that the inspection revealed water damage, and "'Have they made repairs due to water damage?'" *Id.* at 857-58, 621 N.W.2d at 832. The sellers responded they had never experienced leakage/seepage in the basement while living there but they could "'speculate downspout left off once under previous owner to cause spot.'" *Id.* at 858, 621 N.W.2d at 832. The purchaser went forward with the purchase, and after taking possession in May 1997, the purchaser encountered water issues in the basement.

At trial, the county court granted the seller's motion for directed verdict, noting the lack of testimony to support the purchaser's claims. The judgment was affirmed on appeal to the district court. On appeal to this court, we concluded that the sellers did not complete the initial disclosure statement to the best of their belief due to their prior personal knowledge about seepage stains from their 1993 inspection report. However, "[b]ased upon the language contained in the inspection obtained by [the purchaser], her ensuing inquiry in the inspection addendum, and the response by the [sellers], [this court found] that the [sellers] completed the addendum response to the best of their knowledge and belief." *Burgess v. Miller*, 9 Neb. App. 854, 864, 621 N.W.2d 828, 835 (2001). We concluded that the motion for directed verdict was properly granted, since the addendum to the disclosure statement disclosed the condition of the basement to the best of the sellers' belief and knowledge.

We find the two cases discussed above to be distinguishable from this case for the following reasons: The Hutchisons alleged that immediately after they moved in, there was water leaking during rains. Additionally, Charles testified, and

exhibit 5 generally provided, that the Hutchisons experienced several water intrusions in the basement "every time it rained" from March 26, 2016, until Jerry's performed remedial work on August 22 or 23. See *R.J. Miller, Inc. v. Harrington*, 260 Neb. 471, 618 N.W.2d 460 (2000) (purchasers unaware of alleged damage until 7 months after possession of property and admitted it had rained during summer months without causing any water problems). It is true that the Hutchisons testified based on their personal beliefs that the Kulas' disclosure regarding the water intrusion was false, or generally inaccurate and incomplete, and that their photographs contained in exhibit 8 depicting the extent of water damages were taken only during their possession of the property. However, the Hutchisons bolstered such testimony and evidence through their expert, Lauritsen, which presents another distinguishing situation. See, *R.J. Miller, Inc. v. Harrington, supra* (engineer unable to testify as to condition of defective wall at time of transaction); *Burgess v. Miller, supra* (purchaser offered no evidence to support her belief that sellers had water seepage or leakage in past, were aware of it, and hid such information from her at time of sale). The Hutchisons also introduced evidence of home inspection reports; as explained below, the second inspection report contained the inspector's opinion of long-term water intrusion issues.

Charles testified that the home inspector did not note any water intrusion issues after the first inspection, which was obtained prior to closing; exhibit 3, the inspection report summary dated January 21, 2016, confirms his testimony. See *Burgess v. Miller, supra* (inspection report retained by purchaser did reveal evidence of seepage stains). But the same home inspector returned on April 27 to perform a second home inspection, which was obtained after closing. Exhibit 4, the second inspection report, revealed that there were exterior drainage and grading issues and that "all exterior[] areas were frozen and concealed by snow cover during original inspection [in January]." The inspector saw "ongoing water

intrusion through [the] window frame" and noted "[a]ctive dampness" on carpeting in the basement "Rec room," rust stains "originally concealed by [the Kulas'] furnishings," and dampness and standing water elsewhere in the basement. The inspector was of the opinion that efflorescence staining on concrete floor slabs in the furnace room was "an indication of previous (long term) water intrusion issues through floor slabs due to over saturation or possible high water table." The inspector also noted that it appeared the "originally installed drain tile system may not [be] functioning as originally designed and has been this way for some time."

This case is further unlike *Burgess v. Miller*, 9 Neb. App. 854, 621 N.W.2d 828 (2001), where the sellers' addendum explicitly indicated they were speculating about a cause as to what happened *prior* to the seller's possession of the home. In this case, the Kulas provided a disclosure about a water intrusion that happened *during their own possession* of the property. Such disclosure cannot be characterized as speculation given its declarative tone; further, we note the district court's undisputed factual findings as to the water intrusion and leaking window issues:

> [E]vidence and testimony reflected that there were multiple areas of water infiltration that happened during each rainfall after [the Hutchisons] took possession and moved into the Property. [Lauritsen] testified that [the Kulas] would have experienced the same water intrusions as [the Hutchisons], given that the water table had not changed, and rainfall was not significantly different. [Lauritsen] further testified that there is "[a] pattern of long term water intrusion dating back to the [Kulas'] ownership including multiple points of entry and water damage." . . .
>
> . . . [A]lthough [the Kulas] stated that the "minor" water seepage that occurred in 2014 was the result of a neighbor's malfunctioning sump pump, the testimony was less than convincing in that regard. At trial, when asked why [the Kulas] gave the malfunctioning sump

pump as a reason for water intrusion, [Mark] stated that he had no theory on that issue and was just repeating "neighborhood gossip." [Renie] testified that the water seepage problem occurred as a result of the sump pump of the neighbor to the north . . . . [The neighbor], however, testified that she had never had a sump pump malfunction, never told [the Kulas] that she had, and that she had spoken with [Renie] in 2014 about the water problems that they were having.

The . . . water intrusion issues in 2014 were not minor and were not limited to the NE corner of the basement. Testimony . . . indicated that [the Kulas] were having ". . . lots of water and stuff. . ." that started in the northeast corner and then spread over time, progressing along the north wall to the west about 15 feet as time went by. It also progressed along the west wall about five (5) feet to the south. See, Exhibit #8. It is apparent that [the Kulas] were aware that the water intrusion(s) in the basement were not minor and were not solely, if at all, attributable to the neighbor's malfunctioning sump pump.

[The Kulas] also provided . . . that they "added additional drain system." See, Exhibit #1. At trial, however, the evidence reflected that there was no installation of an additional drainage system. Rather, there was an extension to the existing external drain tile.

. . . .

. . . Evidence and testimony received at trial established that there was a steady stream of leaking along the entire top of one of the basement windows.

The factual findings show that the Kulas knew that during the 2014 water intrusion, water was not limited to the northeast corner of the basement as asserted on the Disclosure Statement. We defer to the district court's findings that the 2014 water intrusion was "not minor" and that the Kulas' testimony attributing that water intrusion to a neighbor's malfunctioning sump pump was not convincing. The district court

noted the disclosure of an "'added additional drain system'" and found that evidence showed that there was no such installation. Exhibit 11, Jerry's invoice to the Kulas for basement work in August 2014, confirms that finding. Exhibit 11 reflects that the Kulas had knowledge that they did not add an additional drain system, but, instead, that they paid for the other option proposed to them in the accompanying bid sheet.

Further, the district court noted evidence, including Lauritsen's opinion, which reflected that the Kulas had to know the property was subjected to a history of multiple water intrusions rather than the one-time intrusion disclosed. Lauritsen's report noted water in multiple points of the basement and water entering the basement window as signs of a pattern of long-term water intrusion dating back to the Kulas' possession of the property. Additionally, as described previously, the second home inspection report explained why certain water intrusion issues were not discovered during the first home inspection and included an opinion of long-term water intrusion issues.

### (ii) Garage Door Keypad and Refrigerator

The Hutchisons took possession of the property on March 7, 2016. Charles testified that from the time they moved into the property, the garage keypad entry did not work. He claimed that when Mark came over on May 11, Mark "admitted to [Charles] that there had been problems in the past with the keypad." "He did not say it was not working but they had had problems with it." Mark suggested that Charles change the batteries; "[h]e did not seem surprised that the keypad was not working." The Kulas testified that the garage door keypad was working when they moved out; according to Mark, that is how the Kulas "actually made [their] last exit out of there. We . . . punched the code, garage door shut, closed the pad, and that was our final exit." Mark did acknowledge that about

"60 some days later" Charles contacted him regarding problems with the home and that Mark visited the home to look at the problems.

Regarding the refrigerator, Charles testified that as soon as they moved into the house in March 2016, the food "just never got cold." Charles stated, "[T]he refrigerator doesn't get cold, and the only thing that's changed is title to the house." The Hutchisons had a repairman diagnose the problem on March 26; a fan motor was ordered and installed a week or so later and the refrigerator has worked since then. Although Charles could not say the Kulas knew that the refrigerator was not working, he could "say for a fact . . . that it didn't work when we took possession." However, Renie testified that she "moved out on that Sunday, would have been March 6th," and that when she took everything out of the refrigerator to move it to their new home, "[a]t that time it was cool." She said, "There was ice cubes and everything. So at that time it was working."

The district court found that the Kulas did not complete the Disclosure Statement "to the best of their knowledge" with respect to the garage door keypad and refrigerator. The court stated that "[Mark] Kula testified that there had been problems with the garage keypad when he came out to the property on May 11th. Similarly, when [the Hutchisons] took possession of the Property, the refrigerator was not working."

We note that the district court made an error when finding that Mark testified that there had been problems with the garage keypad when he went to the property on May 11, 2016. We are unable to find any place in Mark's trial or deposition testimony where he admitted to making this statement. Rather, it was Charles who testified that Mark "admitted to [Charles] that there had been problems in the past with the keypad." "He did not say it was not working but they had had problems with it." We conclude that although the district court mistakenly attributed the statement to Mark rather than Charles, there was nevertheless evidence the court could

rely upon that Mark acknowledged having problems with the keypad.

Although there is conflicting evidence as to the Kulas' knowledge about problems related to the garage door keypad and the working condition of the refrigerator, it was not clearly erroneous for the district court to disbelieve the Kulas' testimony as to these problems. When considering the Kulas moved out immediately before the Hutchisons moved into the home, the Hutchisons' testimony that these items were not working immediately upon moving in is sufficient for the trial court to conclude the Kulas had to have had knowledge of the problems. In fact, according to Charles, Mark admitted to past problems with the garage door keypad. And whether a refrigerator is working on one day but not the next is a factual determination dependent upon the believability of the witnesses; such determinations are properly left to the trial court. Further, in our review, we consider the evidence in the light most favorable to the Hutchisons; evidentiary conflicts should be resolved in their favor because they are entitled to every reasonable inference deducible from the evidence. See *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008).

#### (iii) Diseased or Dead Tree

Regarding the tree at issue, the district court found:

> [The Kulas] had scraped the tree repeatedly to see if the bark was green, but testified that they would have to wait until the fall or spring to see if the tree would survive. [Mark] Kula testified that he offered to compensate [Charles] Hutchison prior to purchase if the tree did not survive. [Charles], however, disputed that any such conversation took place; it was his contention that if [Mark] had discussed the diseased tree with him, he would have asked for additional compensation . . . .

We also note that Mark testified he did not know if the tree was "going to come back in the spring or not." Renie admitted

during her deposition that the tree was having difficulties and that the Kulas had noticed leaves had fallen off the tree early, "which is a good sign a tree is in stress, [so that one would] have to wait until later in the fall or spring to see if that tree's going to make it." Given the Kulas' knowledge that the tree was stressed and could possibly not survive past closing, they should have placed a checkmark under "Do Not Know" rather than under "No" on the Disclosure Statement as to whether the tree was diseased or dead. The checkmark under "No" was not an accurate representation of their knowledge regarding the tree.

### (iv) Summary of Violations
### Under § 76-2,120

Based on the foregoing, we find no clear error in the district court's findings and conclusion that the Kulas violated § 76-2,120 with their disclosures related to the matters discussed above because they did not complete the Disclosure Statement to the best of their belief and knowledge as of the date it was completed and signed, and as they were otherwise required by law to update before closing on the property. See § 76-2,120(5).

### (b) Other Theories of Recovery

[7] We need not address the other pled theories of recovery given our decision that the award for damages is supported by the district court's determination of violations under § 76-2,120. See *Rush v. Wilder*, 263 Neb. 910, 644 N.W.2d 151 (2002) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

### 2. THE HUTCHISONS' CROSS-APPEAL
### ON ATTORNEY FEES

On cross-appeal, the Hutchisons claim the district court awarded "only part of [their] attorney fees" and that they are entitled to "all reasonable attorney fees." Brief for appellees

at 46. They point to exhibit 40, which is an affidavit of their counsel showing $19,470.25 in attorney fees as of the date of the affidavit on July 12, 2017, with expected additional fees of $2,200 through trial. Exhibit 40 contains 15 itemized invoices dated from May 31, 2016, through July 5, 2017.

[8,9] A party may recover attorney fees and expenses in a civil action only when a statute permits recovery or when the Nebraska Supreme Court has recognized and accepted a uniform course of procedure for allowing attorney fees. See *Evertson v. City of Kimball*, 278 Neb. 1, 767 N.W.2d 751 (2009). Attorney fees are authorized by statute in the present matter. Section 76-2,120(12) states, in relevant part, "If a conveyance of real property is not made in compliance with this section, the purchaser shall have a cause of action against the seller and may recover the actual damages, court costs, and reasonable attorney's fees." The Nebraska Supreme Court held that "attorney fees are mandatory in an action under § 76-2,120(12)." *Pepitone v. Winn*, 272 Neb. 443, 449, 722 N.W.2d 710, 714 (2006). However, the Nebraska Supreme Court did not state that the total amount of attorney fees requested had to be awarded. Although attorney fees were required to be awarded in this case, the amount constituting reasonable attorney fees remained discretionary to the district court.

[10] When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *McGill v. Lion Place Condo. Assn.*, 291 Neb. 70, 864 N.W.2d 642 (2015). The district court cited to exhibit 40 when it stated that it found that an award of "reasonable attorney fees" was warranted; thus, the record reflects that the district court's award was based upon a review of the pertinent evidence. Based on the record before us, we cannot say the district court abused its discretion by awarding $10,000 in attorney fees rather than the full amount requested.

We note that the Hutchisons also make a cursory request in their brief for attorney fees on appeal. However, said request does not comply with Neb. Ct. R. App. P. § 2-109(F) (rev. 2014), and therefore, we do not consider it here.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

RIEDMANN, Judge, participating on briefs.